179 So. 6

## STIEFFEL v. VALENTINE SUGARS, Inc., et al.

### No. 34563.

Jan. 10, 1938.

Rehearing Denied Feb. 7, 1938.

Hugh M. Wilkinson, A. Miles Coe, and Harry Nowalsky, all of New Orleans, for applicant.

Henry & Kelleher and A. M. Suthon, all of New Orleans, for respondent.

FOURNET, Justice.

This suit was instituted by an employee against his former employer and its insurance carrier to recover compensation for permanent total disability under the provisions of the Employers' Liability Act, Act No. 20 of 1914, as amended, subject to a credit of $235.95 paid him on account of his disability by the insurance carrier.

The defendants admitted that plaintiff was injured and received compensation for

a period of four months, but averred that his disability ceased at that time; that he is now capable of performing the same character of work that he was trained to do, and, in the alternative, that plaintiff's right to recover compensation, if any, is under the provisions of section 8, subsection 1 (d), paragraph 16, of the act, as amended by Act No. 242 of 1928, for a partial impairment of the usefulness of a physical function.

The case was tried on its merits on the issues as thus made up, and the trial judge rendered judgment in favor of plaintiff as prayed for. On appeal taken by the defendants, the Court of Appeal, First Circuit, amended and reduced the amount of the judgment of the lower court from 400 to 100 weeks. 175 So. 425. We now have the matter for review on writs granted by us on plaintiff's application.

In order to properly dispose of the issues involved, it is necessary to give a brief history of the case. The plaintiff, who was in the employ of the defendant, Valentine Sugars, Inc., as a clerk and stenographer, on October 25, 1934, about 7 p. m., while on an errand for his employer, was riding in a Ford truck, owned and operated by his employer, between Valentine Plantation and Lockport, when the truck in which he was riding was struck by another car, and as a result thereof he sustained a serious and permanent injury to his right hip. Plaintiff was immediately brought by a fellow employee to Dr. Gouaux at Lockport, where he was given first aid and then taken back to defendant's plantation. About 12 o'clock

that night, he was examined by a Dr. Jones, his employer's physician, and immediately brought to Hotel Dieu in New Orleans, where he was treated by a specialist for a period of about twenty-three days. He was then moved to his home in an ambulance and there confined to his bed for a period of four weeks, during which time he was visited by the same specialist who attended him while at Hotel Dieu. Thereafter, for a period of more than two months, the plaintiff, first with the aid of crutches and then with a walking cane, visited the doctor's office at regular intervals, and up to the time of the trial of the case he was still walking with the use of a cane.

On February 25, 1935, plaintiff resumed his duties as clerk and stenographer with his defendant employer, at its request, but was discharged on January 11, 1936, in order to give the job to a young man to whom his employer had advanced funds with which to complete the necessary course of study to fill the position plaintiff was holding. During the time of his re-employment plaintiff was paid $50 per month and board, except during the grinding season, when he earned $21 per week and board, making the total amount received, including the board, which was figured as worth 50 cents per day, $797.65.

This suit was filed on February 17, 1936, and on November 12, 1936, the case was tried.

The trial judge concluded that plaintiff was permanently disabled from doing "work of any reasonable character as defined by

the Workmen's Compensation Act," but, on appeal to the Court of Appeal, the defendants reurged their defense that the plaintiff was capable of performing the same character of work that he was trained to do, and plaintiff's right to compensation, if any, was for the partial impairment of the usefulness of a physical function under paragraph 16 of subsection 1 (d) of section 8 of the act, as amended, which defense was sustained by that court.

The Court of Appeal, in its opinion, said: "Our conclusion is that the evidence shows that plaintiff is not incapacitated from doing any reasonable kind of work since his injury as he has and is now able to perform work similar to that which he was doing when injured. Most of the work of a stenographer is done with the mind, the hands, fingers, and body movements and postures. What little walking and manipulations of the lower limbs may be required in this kind of work, we believe plaintiff can do. If he were a carpenter, a mechanic, a logcutter, a painter, a ditch-digger, a farmer, a lineman, or if his means of earning a livelihood depended on any form of manual labor, we would have no hesitancy in reaching the conclusion that his disability affects his capacity to work and therefore his compensation should be controlled by subdivisions (a), (b), or (c) of said section 8 [subdivisional]."

The Court of Appeal further stated: "It is shown that plaintiff before the accident was athletically inclined; he played basketball, baseball, and similar games. While he may be able to earn as much salary as he did before the injury, yet he will not be able to enjoy games, leisure hours, and ordinary comforts as he would have had he not been injured. Under the circumstances of his particular case, we think he should be given compensation under this paragraph [16] for the full period of 100 weeks, which, after all, is less than he would get under paragraph 15 if we accept the estimates of the two doctors as to the disability in the use of his leg. But as we do not think, strictly speaking, the case involves the permanent partial loss of the use of a member as the injury is to the hip, only indirectly affecting the use of the leg, we think the compensation should be based on paragraph 16."

This court has repeatedly held that paragraph 16 of subsection 1 (d) of section 8 of the statute, as amended, does not apply to a case falling within the provisions of subdivisions (a), (b), or (c). Black v. Louisiana Cent. Lumber Co., 161 La. 889, 109 So. 538; Roy v. Mutual Rice Co. of Louisiana, 177 La. 883, 149 So. 508.

It is shown by the uncontradicted testimony of the medical experts that the use of the function of plaintiff's right leg is 74.5 per cent. permanently impaired. This disability, therefore, is compensable under the express provisions of paragraph 15 and necessarily is excluded by the very provisions of paragraph 16, which in terms declares that it is not applicable in cases "falling within any of the provisions already made." If that were the only controversy, plaintiff would be entitled to compensation at the rate of 74.5 per cent. of 65 per cent. of his wages for a period of 175 weeks, but counsel for plaintiff seriously contend that the holding of the Court of Appeal that "plain-

tiff is not incapacitated from doing any reasonable kind of work since his injury as he has and is now able to perform work similar to that which he was doing when injured" is not supported by the evidence.

The writ having been granted to review the question of law, the case is now before us as a whole as if it had been carried directly by appeal to this court. Const. 1921, art. 7, § 11.

After carefully reviewing the testimony in the case, we are convinced that the contention of plaintiff is well founded, and the conclusions reached by the trial judge are supported by the evidence. In his written reasons for judgment, he made a thorough and accurate analysis of the evidence and the law applicable thereto, and we therefore adopt the following from his opinion:

"As the court appreciates the situation, the remaining important issue between the parties is found in the two conflicting averments, viz.:

"(1) By the plaintiff: '* * * said injury causing serious permanent disability due to the shortening of said leg; that he is unable to this day to stand up for any length of time, and still suffers constant pain in his right hip, right leg and right buttock.'

"(2) By the defendants: That, '* * although plaintiff has suffered a permanent partial impairment to his right leg * * such impairment amounts to neither a permanent total nor a permanent partial disability to follow his usual vocation or to do work of any reasonable character, but amounts to a partial impairment in the usefulness of a physical function, as covered by the section, subsection and paragraph cited from Act 20 of 1914, as amended.'

"Thus: Plaintiff's position is that he is permanently totally disabled from pursuing his usual avocation, or from performing work of any reasonable character; and the defendants' position is that he has only suffered a partial impairment of the use of his right leg, compensation for which must be fixed in accordance with section 8, sub-section 1 (d) paragraph 16 of Act No. 20 of 1914 as amended.

"In that situation, the condition of plaintiff's right leg intrudes itself as a factor of prime importance.

"Regarding the limb (leg) itself, apart from the individual, the evidence establishes an original dislocation of the right hip, involving serious injury to the acetabulum. The dislocation has never been entirely reduced and, anatomically, the leg is now one half inch shorter than the other leg; physical measurements show the injured leg to have materially shrunken in size (circumference) as compared with the left leg. It has also suffered a decided limitation of motion and rotation, and is now habitually carried in different position than before its injury, and the flexion of the knee joint is also considerably limited. Walking is accomplished with a decided limp, and frequent pain.

"The court gathers from the testimony of the physicians that the leg has probably been deprived of from 65 to 75 per cent of its usefulness 'as a leg.'

"It **is** plaintiff's contention, however, that the condition of his leg must be viewed with special reference to its effect upon his ability to satisfactorily continue to obtain employment in, and to perform the usual duties of, his professional avocation.

"Relevant to that point, the plaintiff testified:

" 'I would take stenographic notes—and would also do all kinds of filings, all work pertaining to a stenographer and clerical worker. I would do bending over like that. Several times I went to the Valentine store which is a distance of about a hundred yards.'

"It is in evidence that plaintiff had only been employed at Valentine Sugars a few days before he was injured—some three or four—it is, therefore, probable—certainly possible—that he had not yet been thoroughly familiarized with all the detail of activities incident to his position.

"But it is sufficiently plain that his duties embraced something more than the mere taking of stenographic dictation and the transcription thereof on a typewriter. For instance, it is admitted that when he was injured he was acting within the scope of his employment and in the furtherance of his employer's business. When injured, he was riding in a Ford truck several miles distant from the Valentine office, at seven o'clock at night. It must be assumed that availability to make such a trip was one of the duties of his particular employment— hence, that he was available to his employer as a potential messenger or courier (clerical, if you will) within the limits of usual and ordinary travel to and around the neighboring countryside—and probably to greater distances as the needs and interests of his employer might make necessary or advisable.

"Disregarding technical detail, the witness testifies that he remained in the hospital - twenty-three days, was then taken home in an ambulance and remained in bed for four weeks under the care of a physician, after which he visited his physician's office for three months or more, receiving treatment tri-weekly, up to about February 25, 1935. During the first two months of his calls on the physician, he used crutches—thereafter, a cane. That his physician advised him to exercise his leg, which he has done, but with no improvement.

"As to his present condition, he says:

" 'I am unable to walk normally. I limp and have to use a cane. At times it feels like my leg is going to give way and if I didn't have a cane, I would fall to the ground. I suffer pains in my leg, in my hip and in my right buttock. I have to move around slowly and sometimes I have to wait awhile before I can walk. I get "Charley horses" in my leg, sometimes two a day. I suffer pain while sitting down and when I get up or sit down, and when I am in bed I can't turn over without pain. When attempting to walk the pain is in my hip—it sort of clicks together like out of socket, and you can hear it at times.'

" 'I am not able to do the same character of work as before, because I can't stoop

down to file papers and I can't walk around as fast as I would like.'

"Cross-examined on this phase of his testimony:

" 'Ques. You have been sitting in the witness chair approximately an hour and a half, have you not? Ans. Yes.'

" 'Ques. Have you any pains now? Ans. Right in my right buttock. It hurts me now and I probably will have a charley horse when I get up.'

" 'Ques. Would it relieve you to stand up for a few minutes and move around? Ans. Yes, sir, it would.' Note: Witness got up and walked around. The court does not doubt that the witness was feeling pain at that time.

"Relative to his re-employment by the Sugars Company on and after February 25, 1935, up to January 11, 1936: Being asked whether his duties were the same as before the accident, he replied:

" 'Practically the same. But I couldn't do all the work I did before the accident, for instance, if they had an adding machine to be moved from one place in the office to another, I had to get Mr. Gaubert to help me move it, and if I wanted to stoop down and lift up something he had to do it for me.'

" 'Question: As to the taking of your stenographic notes and the transcribing of the same, you could do that very well? Ans. Yes sir, but the only thing it hurt me to sit down too long, and in arising.'

"He admits that he was not ill or laid up during this time of employment, but adds 'The only thing my hip hurt me a lots of times and I would go and treat it. I borrowed a lamp from the office and I had one of these incandescent globes and I would bake my leg as much as I could.'

"Questioned as to the use of a stick, he replied: 'It all depended on the feeling of my leg. If it hurt me I used the stick, and at times it didn't hurt me and I didn't use it.'

"He admitted that he occasionally went on errands, saying: 'I could go with the stick, but it didn't stop it from hurting me at times.'

"The riding of a horse once; tennis, once or twice; and one or two dances in pursuance of advice to exercise his leg, and the abandonment thereof when it resulted in a worse condition, has already been noted.

"The physicians all agree that his leg is shorter and that he necessarily walks with a limp as a consequence of its present condition; and none of them are willing to challenge the sincerity of his protestations of frequent pain, and they appear, on the contrary, to agree that such manifestations of pain 'are likely'.

"Mr. Barker, the general manager; Mr. Rivet, cashier; and Mr. Marcello, agriculturalist of the defendant, Valentine Sugars, unite in testifying that plaintiff's services after his injury (from February 25, 1935, to January 11, 1936) were efficient and entirely satisfactory.

"As to his duties, Mr. Barker says: 'Well, he was employed as a stenographer, to do mostly stenographic work for me, and such

general clerical work, assisting as may be necessary.'

" 'Ques. Did that include errands to the sugar house and store, if called upon to do so? Ans. Yes, sir, if he would be asked to take a test over to the sugar house or go to the store, he would go. He was not an errand boy, however, and I don't mean to insinuate that.'

"Note: Mr. Barker evidently related his above two answers to plaintiff's first employment—before the accident.

" 'Ques. Well, now about the second employment? Ans. Well, the first employment only lasted four days. There wasn't much employment then. Now, the second employment began in January and he just did stenographic work, filing in the office, until the grinding season, when he became the assistant cane clerk.'

" 'Ques. What have you to say—as to the character of Mr. Steiffle's work—through his second period of employment—? Ans. He was perfectly satisfactory. You are speaking of the stenographic work and the work that he did in the office?'

" 'Ques. Yes. Ans. Perfectly satisfactory.'

"Obviously, Mr. Barker's enumeration above as to plaintiff's duties under his first employment must be read in connection with the admission in respondents' answer to plaintiff's allegation '3', viz., 'that petitioner received his injuries on Oct. 25th, 1934 while he was acting within the scope of his employment and in the furtherance of his employer's business, "and" while, as

elsewhere alleged, riding in a Ford truck several miles distant from his employer's office.'

"To Mr. Barker's answer as above phrased relative to plaintiff's first employment, must be added the further duty of attending to such errands as he was engaged in on October 25, 1934.

"Did plaintiff assume or undertake to perform such duties during his second employment?

"Mr. Barker's reply is, as quoted just above, 'Now, the second employment began in January and he just did stenographic work, filing in the office, until the grinding season, when he became assistant cane clerk.'

"It thus appears that during that grinding season, plaintiff was assigned the duties of assistant cane clerk. It may be accepted that the duties of an assistant cane clerk are different from those of a stenographer, though we are not informed as to their nature in detail. So that the manner in which he handled them is not necessarily enlightening as to his then ability to perform the same duties that he undertook under his first employment. Indeed, when asked immediately thereafter as to the character of plaintiff's work, Mr. Barker was careful to assure himself as follows: 'You are speaking of the stenographic work and the work that he did in the office?' Whereupon he affirmed that it was 'perfectly satisfactory.' This carefulness would seem to exclude his work as an assistant cane clerk from coverage by the answer 'perfectly satisfactory,' and strongly suggests the

possibility that the character of his work as assistant cane clerk may not have been entirely satisfactory—else, Why the preliminary stipulation, 'You are speaking of the stenographic work and the work that he did in the office'?

"From February 25, 1935 until the grinding season, Mr. Barker says that 'he just did stenographic work and filing in the office.' So that, during this period, plaintiff's duties were not as broad and comprehensive as under the first contract of employment—in that they do not appear to have extended beyond activity in the company office—and certainly did not cover such activity as he was engaged in on the day that he met his accident in a Ford truck some miles away from the company office. Without regard to 'how satisfactory' he discharged the duties of this second employment, it does not appear that he was expected or required to be as versatile in his activity as he had found necessary within the scope of his duties under the first employment; or that a satisfactory efficiency in his second position supplies evidence that he was still physically able to assume and perform the duties included in his first employment.

"Now, as to his actual experience under his second employment, the plaintiff testifies that he worked under the handicap of constantly recurring pain; the necessity of keeping handy his stick for fear that he might at any time fall; the pain of stooping and bending in doing filing work; the necessity of asking, at times, for assistance in the moving of an adding machine or other heavy article; the affliction and annoyance of being assailed by pain when he kept his seat for any considerable length of time, as well as in the act of sitting down or arising; and having, at times, to warm his thigh artificially with a light bulb in order to alleviate his pain—none of which is convincingly rebutted or discounted by the defense.

"The indicated conclusion is that not only were his duties as a stenographer and filing clerk, from February, 1935, to the grinding season, less onerous physically than those of his first employment, but that (though he performed them to his employer's 'perfect satisfaction'), in their performance he was seriously handicapped by constantly recurring pain and enforced awkwardness of motion and movement, and a lessening of reasonable and usual promptness and rapidity of movement.

"Instead of impeaching his account and conclusions, the incidents of the lone horseback ride, a couple of tennis games and a few attempts to dance, rather confirm his account of his weakness, which in each instance prompted his abandonment of the effort. Mr. Barker, himself, assigned his crippled condition as his reason for not wanting him to ride his horse again.

"A man who cannot safely ride a horse for half a mile, step awkwardly around a tennis court with country amateurs, or limp through a few dance steps is manifestly ineligible safely to be charged with missions in a Ford truck taking him several miles away from his office, as was this plaintiff under his first employment.

"It cannot, therefore, be held that the circumstances of his second employment

establish that plaintiff is not disabled from satisfactorily undertaking to perform the duties of the employment in which he was engaged when he was hurt.

"Plaintiff was offered employment by Valentine Sugars for the term of the grinding season beginning in October, 1936. Mr. Barker says 'we were trying to find a cane clerk and it struck me that we might get his services again.' The position tendered was, therefore, that of 'cane clerk'—rather than that in which he was employed when his leg was injured—and does not, therefore, carry evidence that he was still appraised as competent to undertake the duties which were his under the first contract. It is also a fact that he first accepted the offer, but subsequently declined it because he thought he had the prospect of 'lining up' something better, a hope in which he was disappointed.

"This inclination to accept this last offer only shows that he deemed himself capable of undertaking the duties of the preceding 'grinding season' as a cane clerk—it does not gainsay his position that he is presently incapacitated again to undertake and competently perform the duties assumed by him in his first employment.

"In passing, it will be noted that this offer of employment was restricted to the 'grinding season,' a period usually restricted to three months or less.

"Aside from the fact that it was natural to turn down such an offer in the lure of a prospect for something better—perhaps a full-term employment—the fact that such an offer was made, restricted to a purely short seasonal demand, does not satisfactorily establish that plaintiff, in his present physical condition, is a likely candidate for acceptance for regular employment in the general market for stenographic and clerical talent. Indeed, though he has diligently applied himself to the task, the only employment that he has been able to contract since his accident has been from this defendant—and then in a different capacity and lessened duties as compared with his first employment. Out of employment from January 11, 1936, the only offer was a temporary employment as cane clerk 'during grinding'—with the prospect that history might repeat itself until, perhaps, the 'grinding season' of 1937 rolled around, and the defendant, 'perhaps,' might again find itself 'short of applications.'

"It is also a matter of note that, although this plaintiff is professionally competent and has to his credit years of satisfactory service to various employers, he has, in his present disabled condition, received no offer of employment in spite of diligent effort, other than from the defendant Sugars Company, the last being made after the filing of the instant suit.

"While Mr. Barker is certain that the possibility of a claim being pressed against his company had no place in his mind when tendering to plaintiff these two positions, or that the insurance company made any such suggestion—and that the tender of employment was made because he found himself in need of a man, and it occurred to him that, perhaps, the plaintiff would be available; and knowing him, felt that he would satisfactorily 'fill the bill'—the court is left with the impression that Mr. Barker's

sympathy and feeling for the unfortunate victim of a regrettable accident that had occurred within his business organization, constituted a partial factor in his tender of subsequent employment to the plaintiff.

"Two circumstances suggest this impression: First: 'Question by the court: To what extent, if any, did your sympathy figure as a factor in your re-employing Mr. Steiffle in 1935? Answer: Well, at the time there were three men who applied. I employed him and I think my sympathies swayed a little in giving him the employment.'

" 'Ques. Were your sympathies due to his accident? Ans. That is correct.'

Second: The plaintiff (page 12) testified: 'I went and asked Mr. Barker for a raise and he told me that it was more out of feeling sorry for me that he had given me the job.'

" 'Question (page 18): Did you give any reason why you thought you should get a raise at that time? Ans. No, I just asked Mr. Barker if my work was satisfactory and he said in his usual gruff manner that my work had been about mediocre and that he had just given me a position because he felt sorry for me. Whether he was joking or not, I don't know, but that is what he said.'

"Questioned as to this incident (on page 62), Mr. Barker said: 'I don't remember the occasion but I presume it must be so.'

" 'Question: I think he testified that in a portion of your reply you stated that you felt sorry for him—is that liable to be true?

Answer: Well, I think that would probably be true, but I want to say this that I would not keep feeling sorry for him if his services were not satisfactory.'

" 'Question (bottom of page 62): In other words—there were other applicants—and your sympathies weighed in giving him the preference and you would not have kept him if he had not been worth the money paid to him, is that correct? Ans. Yes, sir. My recollection is that there were three applications for the job at $50.00 a month and he was offered the refusal over the three others. Two of the other applicants were strangers, that is my recollection.'

"That Mr. Barker considered him competent to hold this 'summer-time' $50 position, and would not have kept him if he had not performed his new duties satisfactorily, including that of 'cane clerk' when the grinding season arrived, is not now the interesting point.

"The real point of interest is that Mr. Barker's humane or personal sympathy did figure as a factor in securing to plaintiff the offer of this position. Query? But for that factor (sympathy), can it be certain, or assumed, that plaintiff would have received it? Other employers, including several for whom he had worked satisfactorily before, but in whose employ he had suffered no accidental misfortune, after viewing his present physical condition, have uniformly refrained from giving him employment. It is entirely possible that but for this sympathy, which does him credit, Mr. Barker would, as all other prospective employers have uniformly elected, have turned aside the 'evident cripple', and felt that he

was exercising good judgment in selecting an equally available 'physically sound' employee. In that situation of affairs, can it be concluded that an injured man who, though he may be competent, must rely upon good-natured sympathy for preference in competition with the physically sound, is not practically barred from the hope of future employment?

"Certainly, the mere fact that 'sympathy' may have turned the scale in his favor in obtaining this particular position, which did not impose upon him as onerous duties as characterized that of his first employment—nor the fact that he pleased his employer in the discharge of his new duties—does not establish of itself the proposition that he was not, as the result of his accident, rendered unable and incompetent to undertake and perform successfully the exact duties that attached to his first employment.

"Mr. Barker affirms that, even though his sympathy was enlisted, he would not have kept him had he not proved efficient and satisfactory, and there is no doubt but that is Mr. Barker's present estimate of the situation. But there still looms the suggestion that Mr. Barker's warm-hearted sympathy could not have been entirely quenched by the act of employment. By its very nature, the sentiment having extended a protecting arm to its object, must have continued to abide in the heart that prompted its manifestation—with the result that Mr. Barker, now somewhat in the role of succorer or 'protector of the unfortunate,' was likely to ripen into a sympathetic or lenient critic, and thus view as 'entirely satisfactory' a character and method of service that would fall short of 'entirely satisfactory' to an ordinary employer not animated by Mr. Barker's initial sympathy. So that the very sympathy that prompted Mr. Barker to tender the plaintiff the second employment may not have been a nonnegligible factor in assuring Mr. Barker's approval of plaintiff's subsequent efficiency.

"But for that sentiment, Mr. Barker, like all other employers to whom plaintiff has presented himself in his crippled condition, might have 'noted his application,' then proceeded to forget about it. Since he is the only employer that has, since the accident, regarded plaintiff's desire for employment with any responsive favor, it strongly suggests that his present physical condition does, 'in the eyes of employers,' discount the possible value and efficiency of his services.

"That an applicant's physical appearance and condition is in itself such as to prompt prospective employers to 'turn aside' and seek for a more robust and active physique —and that, they all appear to have done with the sole exception of Mr. Barker who yields to the pleadings of a kind heart—pretty clearly indicates an apparent physical incompetence to undertake the duties of a position.

"That, in the routine performance of even lesser duties, the individual suffers constantly recurring pains, repeated and emphasized when he sits down, or arises; that, at times, he needed the assistance of a stick to be assured of not falling; and that, at other times, he found it necessary to take

time off and bake his leg with an incandescent light globe, confirms the indication and hardens the anticipation of weakness into the demonstrated fact of physical incompetency.

"The further fact that this man's only opportunity of employment, notwithstanding a persistent offering of his services since his accident, has been with Mr. Barker—and that that opportunity now appears to have dwindled to only a possible employment as 'cane clerk' during two or three months of the year, appears to indicate that plaintiff's crippled condition has effectually eliminated him from favorable consideration at the hands of prospective employers.

"Having regard to the established actual physical injuries resulting from his mishap, although they are localized in his right knee, hip and buttock, and taking cognizance of the effect thereof, not only on the original health, strength, and physical activity of the individual, but (because of a sense of physical inadequacy and the disturbing affliction of frequent, if not constant, pain in his hip and buttock—often amounting to a 'charley-horse' and, at other times, compelling a rest and resort to the artificial heat of an incandescent light-globe for relief), on his nervous system and consequently upon his power of calm mental reflection and concentration, and consequent value as an expert and accurate practitioner of a 'specialized' type of skill, it becomes impossible to conclude that the injury to the 'individual' as an 'earning unit' of industry can be estimated in terms of 'percentage impairment' of the functions of the 'leg' alone.

"That conclusion eliminates defendants' suggestion that reparation or compensation for plaintiff's injuries should be awarded in accordance with section 8, subsection 1 (d), par. 16, of Act No. 20 of 1914, as amended, Knispel v. Utilities Co., 174 La. 401, 141 So. 9; Black v. Lumber Co., 161 La. 889, 109 So. 538.

"That plaintiff's injuries are permanent, is supported by more than a fair preponderance of the evidence in the record.

"Are they total? Or partial?

"In the Knispel Case, where the injury resulted in 'double sight' when the workman used both eyes—though by closing or 'shading' either eye, he could see normally, unconfused by the phenomena of 'double sight' —the court held the disability to be total and permanent as related to his employment, remarking, 'It is only by using both eyes together and by exercising them that plaintiff can hope to recover. He cannot be expected to sacrifice that chance by closing one eye,' and further commenting, 'The Act should be interpreted with reasonable liberality.' 'Should time bring recovery, the law provides a means of modification.' The court found his disability total for work of reasonable character, within intendment of law.

"In Yarbrough v. Great American Indemnity Co., La.App., 159 So. 438, 442, the court said: 'It is not in keeping with the spirit and philosophy of the Workmen's Compensation Law to say that an injured laborer is not totally disabled to do work of any reasonable character, under its provisions, because he may be able to do some

sort of work, even though in doing so physical pain and discomfort rack his body or some of its members; and, as in this case, where it appears that by performing the sort of labor plaintiff was performing as an avocation when injured, the pain and discomfort is increasingly aggravated, it would be a traverse of the humane spirit of that law to say that he is not entitled to the maximum of compensation provided by it. We think plaintiff's condition should be regarded as one of total disability to perform the character of work he followed when well. * * * It may be he could perform, in whole or part, the duties of a position wherein only light or inactive effort is required, but where are such positions obtainable? Industry is not looking for men who are only able to do light work.'

"In effect, the court's position amounted to this: 'When an injured employee is unable to do work of the same description that he was employed to do when injured, his injury, in contemplation of law, is equal to total disability.'

"In the Black Case, 161 La. 889, 109 So. 538, the court held substantially the same; and, after referring to that case, it said further, in the Knispel Case:

" 'The disability should, we think, be deemed total to do work of any reasonable character, within the intendment of the law, whenever it appears that the employee, due to the injury, is unable to perform work of the same or similar description that he is accustomed to perform.'

"In Pete v. Metropolitan Life Ins. Co., La.App., 171 So. 868, the court says:

" 'Total and permanent disability from performing any work for compensation or profit does not require that insured become absolutely helpless, but merely requires such disability as renders him unable to perform substantial and material part of his occupation in usual and customary way.'

"As to work that employee was shown to have done after injury, though accompanied by pain and exhaustion, the court said:

" 'He is not to be penalized for the faithful effort which he has made to earn a bare subsistence.' His efforts to work only go to show his incapacity to work. The provision 'does not mean that plaintiff must, in order to avail himself of these benefits, become absolutely helpless, but merely requires such disability as renders him unable to perform the substantial and material part of his occupation.' The Court then cites Crowe v. Equitable Life Assur. Soc., 179 La. 444, 154 So. 52; Marshall v. Metropolitan Life Ins. Co., La.App., 164 So. 441, and White v. Metropolitan Life Ins. Co., La. App., 166 So. 655, and notes that 'on a state of facts showing that the plaintiffs in those two cases, both railroad laborers, were disabled from performing hard manual labor, but who could nevertheless perform certain kinds of work, they were allowed to recover. Those two cases are persuasive in the present case.'

"In the instant case, the court regards it as certain that the plaintiff, in his present condition, is not physically competent to undertake regularly, safely, and efficiently to perform the duties which he assumed and

performed when first employed by the Valentine Sugars Co.—particularly, the type of activity he was engaged in at the moment of his injury, viz., attending to an errand in a Ford truck at 7 o'clock at night several miles distant from his office. In addition, it is satisfactorily shown that he is unequal to anything like reasonably constant physical activity in and about an office itself, where he is required to pass from room to room, handle chairs, typewriters, adding machines and their stands and supervise files that require frequent stooping and moving about, 'sitting down' for long periods and arising from a sitting to an erect position, all of which either provokes, or is accompanied by, more or less pain and discomfort, and has frequently to be followed by ameliorative treatment. 'Competency,' accompanied by active pain, amounts to disability.

"His injuries must, therefore, for present purposes, be classed as amounting to permanent total disability within the intendment of the law."

For the reasons assigned, the judgment of the Court of Appeal, First Circuit, is reversed, and the judgment of the district court reinstated and affirmed; defendants to pay all costs.