Mrs. Ethel C. Bruns, employed by the Bemis Brothers Bag Company as a "clipper," or "overlooker", alleges that, on September 27, 1939, while so employed and while acting within the scope of her employment, she sustained an injury which has "totally and completely disabled her and she is unable to walk as a normal person, or to perform the duties she was performing at the time of the injury", and that she is "totally and permanently disabled from doing any work of a reasonable nature for which she is fitted and qualified". She alleges that, while performing the duties of her employment she sustained a fall, producing a severe and permanent spinal injury; that, unknown to her, "there existed in her system a dormant, latent disease (syphilis)", and that, as a result of the fall, this disease was awakened and stirred into activity and that said activated infection or disease has disabled her as above stated. Plaintiff seeks compensation in the amount of $10.40 per week for a period of four hundred weeks, subject to a credit in the amount of $72.01 covering payments which, admittedly, have already been received.
Bemis Brothers Bag Company, for answer, admits that plaintiff sustained a fall on September 27, 1939, but avers that the injury was not of a serious nature; that plaintiff was given first aid treatment at its office and thereafter regular treatment at a hospital, and that, on December 30, 1939, she was pronounced cured and accordingly was discharged; that from the date of her injury to the date that she was pronounced cured, she was paid compensation at the rate fixed by law. Defendant denies the injuries plaintiff claims to have suffered as a result of her fall, or that any permanent disability has resulted therefrom, as alleged; that, if she is now in any way disabled, her condition was attributable entirely to and caused by the disease referred to in her petition, a condition not caused by or contributed to by the accident.
For further answer, defendant alleges that, in the event it is found that plaintiff is entitled to compensation, then defendant is entitled to have and receive a credit thereon in the amount of $72.01, in addition to the sum of $207.60 expended by it for medical services.
Assuming the position of plaintiff in reconvention, defendant avers that, in the event of a finding that plaintiff is not entitled to compensation, it is entitled to have judgment against plaintiff, defendant in reconvention, in the sum of $279.61, the aggregate of the amounts paid as compensation and for medical expenses as a result of an error of fact.
After a protracted trial below, our learned brother rendered judgment in favor of defendant, dismissing plaintiff's suit, from which judgment plaintiff now prosecutes this appeal.
Plaintiff's counsel have devoted a portion of their brief to the contention that defendant was engaged in a hazardous trade, business or occupation. There can be little dispute over this question. Though defendant denies that its business was of a hazardous nature as contemplated by our Workmen's Compensation Law (Act No. 20 of 1914, as amended), in oral argument and in their brief, counsel for defendant concede that defendant's business falls within the terms of the statute. Our jurisprudence is definitely settled that, in determining whether an employee comes within the protection of the compensation laws, the only real consideration at issue is the nature of *Page 144 
the employer's business, and, when it can be established that the employer's business is hazardous, the particular work of the employee is unimportant so long as he, the employee, is engaged in an integral branch of the hazardous field. The compensation statute does not require that the service in which the employee happens to be engaged at the time an injury is received must be hazardous or perilous. The vital question is whether the regular occupation, business or trade in which the employer is engaged is hazardous or not. Gilyard v. O'Reilly, 4 La.App. 498, 499; Stockstill v. Sears-Roebuck and Company, La.App., 151 So. 822; Wright v. Louisiana Ice and Utilities Company, 14 La.App. 621, 129 So. 436; Richardson v. Crescent Forwarding and Trans. Company, Ltd., 17 La.App. 428, 135 So. 688; Crews et ux. v. Levitan Smart Shops, La.App., 171 So. 608; Stieffel v. Valentine Sugars, Inc., 188 La. 1091, 179 So. 6; Franz v. Sun Indemnity Company of New York, La.App., 7 So.2d 636, decided April 13, 1942.
The record leaves no doubt that plaintiff sustained an accidental fall, such as alleged in the petition and described in her testimony and corroborated by her co-employees. We are convinced that, while performing the duties required by her employment, she accidentally "slipped", or tripped on a cardboard "cone", precipitating her backwards to the floor. Undoubtedly some injury resulted from this fall, for it is shown that, after receiving first aid treatment at the office of defendant company, she was taken to the hospital, where she was treated and had her back taped, after which she was returned to her home. It is also shown that, on October 6, 1939, about a week following the accident, she was again returned to the hospital, remaining there under treatment until October 24, 1939.
Plaintiff contends that, as a result of this accidental fall, she sustained a severe and permanent spinal injury which awakened and stirred into activity a latent and dormant disease, syphilis, as a consequence of which she is permanently and totally disabled from performing work of any reasonable character, or for which she is fitted by training or experience. This is the most serious question in the case.
In support of this contention plaintiff relies upon the testimony of eminent specialists, primarily Dr. H. Randolph Unsworth. The record shows that about a week following the accident, and while plaintiff was under the medical care of defendant's physician (Dr. Octave C. Cassegrain), Dr. Unsworth was called into consultation. After a perfunctory examination, Dr. Unsworth ordered plaintiff removed to the Mercy Hospital. Upon again examining plaintiff, he concluded that plaintiff had suffered a spinal cord injury, and, from that, interpreted that she had a dormant syphilis, which had become activated by the trauma caused by the fall. Based upon this interpretation, he suggested laboratory tests, both the Wasserman and spinal fluid methods. Both tests proved negative. Accepting Dr. Unsworth's interpretation, Dr. Cassegrain then ordered plaintiff under a treatment of iodides, which was continued for a period of ten days. Following this treatment, a second Wasserman test was made, the result of which proved positive. Thereupon, Dr. Unsworth turned plaintiff over to Dr. Cassegrain for treatment. It is shown that plaintiff did not return to Dr. Unsworth for treatment until May 21, 1940. From that date, up to the time of the trial, he treated her for active syphilis, having testified below that she was still under treatment by him.
Dr. Martin O. Miller, another specialist summoned by plaintiff testified that he had examined plaintiff on June 14, 1940, with Dr. Edmund Connelly and Dr. Cassegrain. After plaintiff had informed him of her complaints, his examination disclosed, as testified to by him, no atrophy of the muscles of plaintiff's leg, no paralysis, and that the reflexes of the ankle and knee were normal in both extremeties. He concluded that plaintiff presented no evidence of any disability. He further stated that it was an accepted medical fact that it is possible to obtain a positive Wasserman from one not suffering from active syphilis and that it is equally true that a negative finding could be had from one suffering from syphilis, stating that neither finding could be said to be definite. Perforce, he further stated that, before concluding that plaintiff was actually suffering from this disease, he would recommend several other tests.
Dr. Gilbert C. Anderson, an equally eminent neurologist, examined plaintiff on June 20, 1940. He testified that, conceding the fall said to have been experienced by plaintiff, followed by a laboratory test showing negative and then by a second test showing positive, he would not conclude that the fall activated or awakened the disease. He further stated that he would not concede the correctness of Dr. Unsworth's findings, based purely upon one test, without a further *Page 145 
and more exhaustive inquiry. From his examination of plaintiff, he testified that she was not suffering from either a serious or permanent disability, but that, undoubtedly, she had experienced a painful injury.
Dr. Dean H. Echols, an equally eminent neurologist, at the request of Dr. Unsworth, examined plaintiff on July 22, 1940. From this examination he concluded that plaintiff had ruptured a small artery in the spinal cord, which had caused damage in that region. He made no medical test to determine whether plaintiff was suffering from syphilis, but, since Dr. Unsworth had concluded this to be a fact, he, Dr. Echols, in turn became convinced that she was a sufferer from that disease. He testified, however, that the dormant syphilis could have been brought into activity by either the iodides treatment administered by Dr. Cassegrain — which he termed a "provocative" treatment — or could have been occasioned by the fall itself. In conclusion he stated that he was not prepared to say that the fall experienced by plaintiff produced the rupture of a blood vessel, or that the obstruction in the blood vessel caused the fall, with syphilis playing no part in the accident.
In support of its contention, defendant produced the testimony of specialists of equally established reputation. Dr. Cassegrain testified that, upon examining plaintiff immediately following the accident, he diagnosed the injury to be a strain of the sacro lumbar region. Inquiry by X-ray proved negative. After strapping plaintiff's back, he sent her home, where she remained for a period of a week under his treatment. A week following the accident plaintiff complained of weakness and numbness in her left leg and this complaint prompted his calling Dr. Unsworth into consultation, when it was concluded to immediately remove plaintiff to Mercy Hospital. Her leg was then immobilized and the following day a spinal puncture was made, but this showed no blood in the spinal fluid, although Dr. Unsworth had concluded that plaintiff had had an apoplexy of the spinal cord, or, as it is termed medically, hematomyelia. Dr. Cassegrain, not being a specialist in neurology and having had no medical experience in matters of that nature, testified that he readily accepted Dr. Unsworth's interpretation of plaintiff's ailment and, accordingly, ordered the administration of iodides and anti-syphilitic treatment. A Wasserman test made ten days after the administration of iodides resulted in a positive showing. He continued treating plaintiff following her removal from the hospital on October 24, 1939, until December 30, 1939, concluding at this latter date that plaintiff was entirely cured, with no evidence of any impairment or disability.
Dr. Charles S. Holbrook examined plaintiff on February 1, 1941, with Dr. Connelly and Dr. Unsworth. He testified that he gave plaintiff as thorough and complete an examination as medical science afforded and that this examination disclosed no evidence of disease, no organic disturbance of the nervous system, and no indication of any serious injury having been sustained in the past; that plaintiff had never had an apoplexy, or any hemorrhage of the spinal cord. He described a hemorrhage or apoplexy of the spinal cord as being comparable to the "blow-out" of an automobile tire, stating that the symptoms are rapid and severe. He stated that, if plaintiff had had such a hemorrhage, irreparable damage would have been done, such as softening of the spinal cord, resulting in dead cells and tissues, a condition which would have presented itself immediately after the injury instead of developing days afterwards, and which, today, would undoubtedly be clearly evident. He further testified that he found no evidence of syphilis or why such a disease should have been suspected; that, in blood tests two negatives and one positive finding "certainly does not show syphilis is established by any means"; that it was good medical practice not to accept one positive report as an indication of the presence of this disease, adding that neither would one positive report justify the administration of anti-syphilitic treatment. He testified, also, that during his examination of plaintiff, he requested Dr. Unsworth to demonstrate to him, if he could, any evidence of disability, disease, organic disturbances, or lesion, and that, after endeavoring to do so, Dr. Unsworth admitted his inability. From his examination he concluded that plaintiff was in normal good health, having no organic trouble of any nature; that undoubtedly plaintiff had sustained a fall which produced a period of invalidism, but that she was now fully recovered therefrom; that this fall did not occasion any lesion, or activity of plaintiff's central nervous system, and that there was no evidence of any actual cerebro-spinal syphilis. He further concluded that plaintiff's assumption of weakness of the limb was entirely functional; that, from plaintiff's own statement, her complaint was confined to being "easily tired"; that this functional *Page 146 
disturbance, contrary to organic trouble, can be associated to an "industrial insurance complex".
Dr. Edmund Connelly, also an eminent neurologist, examined plaintiff on June 14, 1940, together with Dr. Miller and Dr. Cassegrain. He found that there was no evidence of paralysis, or atrophy, or tremors; that her reflexes were equal and her pupils normal, and that no disturbance appeared in the ocular muscles. He likewise found nothing to indicate a central nerve lesion and asserted that one positive Wasserman was certainly no indication of syphilis in the central nerve system. In connection with the positive Wasserman, he recommended that another lumbar puncture be made. It is shown that Dr. Unsworth made the lumbar test, which resulted in a negative finding.
Dr. Connelly again examined plaintiff on February 1, 1941, with Doctors Holbrook and Unsworth, and from this examination all findings again proved negative, and, as he stated, more so than when he had previously examined her in June of 1940. From this subsequent examination he found no evidence except that plaintiff was a normal person, with no weaknesses, and that there was no indication of syphilis ever having existed, particularly cerebro-spinal syphilis. He testified that, having observed plaintiff walk, there was no question in his mind respecting the absence of any organic lesion. He is in accord with Dr. Holbrook in stating that, had plaintiff suffered a hemorrhage or rupture of a vessel in the spinal cord because of a fall, "she would have had residuals", which, upon examination, would have been immediately evident, for he stated that, in the case of a hemorrhage of the spinal cord, which he described as being identical with apoplexy of the brain, the symptoms are immediately noticeable and do not develop gradually. He concluded that plaintiff was not suffering from any organic trouble and that there was no physical indication that she was suffering from any type of injury. He also concluded that the only complaint made by plaintiff during both examinations — that of uncertainty of strength in the leg — was purely a functional condition, not attributable to any organic disturbance, and that it was his firm belief that the evidence presented was sufficient to create the suspicion that she was malingering.
A review and analysis of the testimony in this case presents us with seven medical specialists, who, so far as the record discloses, stand on equal footings with respect to professional and personal integrity, and whose testimony in a case of this character ought to be of equal weight. Unfortunately, their findings and opinions present irreconcilable conflicts.
Here we find Dr. Unsworth interpreting plaintiff's condition as that of "dormant syphilis" brought to a crisis by trauma resulting from a fall. He assigns the awakening of this dread disease to the fact that plaintiff sustained a severe and permanent spinal injury producing a hemorrhage of the spinal cord, medically termed hematomyelia. Reviewing his testimony as to the first and third negative findings, we find that his diagnosis of a severe spinal cord injury is purely an assumption on his part, with no positive evidence to support such a conclusion. We find him conceding as not wanting to be understood as testifying "definitely", and then admitting, thereafter, that he is positive that plaintiff did not experience a hemorrhage in the spinal cord. In the face of this positive admission, he testified that, irrespective of that fact, plaintiff was suffering from syphilis and "got well under treatment". Further inquiry into his testimony discloses that the entire foundation for his diagnosis of syphilis was the one positive Wasserman as opposed to two negative Wassermans, one negative spinal fluid test and the added factor that plaintiff showed no other evidence of that disease. It is conceded by all of the specialists who testified that one positive Wasserman "by no means" was an indication of syphilis, it being medically accepted that one positive Wasserman can be obtained from a patient free from the disease.
We are much impressed with the testimony of Doctors Holbrook, Connelly, Cassegrain and Anderson, whose opinions and findings are in substantial accord. An analysis of their testimony discloses their unanimous opinion that plaintiff did not suffer a cerebro-spinal injury, nor was plaintiff suffering from dormant syphilis which could have been awakened by a trauma. They show that, had plaintiff suffered a spinal cord injury, or hemorrhage of the spinal cord, the effects would have been apparent immediately following plaintiff's fall and would not have developed gradually, as is sought to be maintained by plaintiff; that, had such an injury resulted, it would have produced "residuals", which would be easily discernible today, *Page 147 
and that a single positive Wasserman finding, as opposed to the several negative findings, would not warrant the conclusion by any medical practitioner that plaintiff was suffering from cerebro-spinal syphilis. The record shows that they are confirmed in their opinions by reason of the fact that all of the specialists who testified — both for plaintiff and defendant — agree that plaintiff is a normal person, totally free from neurological or organic disturbances, and, hence, under no disability.
We are not unmindful of our well settled rule, also elsewhere recognized, that the fact that a person was already afflicted with a dormant disease is no reason why he should not be allowed compensation for an accidental personal injury that causes the disease to become active or virulent and superinduces disability. Behan v. John B. Honor Company, 143 La. 348, 78 So. 589, L.R.A.1918F, 862; Jackson v. Travelers' Insurance Company et al.,180 La. 43, 156 So. 169. See, also, Robichaux v. Realty Operators, Inc., 195 La. 70, 196 So. 23, and cases therein cited and relied upon.
Obviously, in cases such as this, courts are called upon to rely upon the testimony of medical experts. Judges possess no independent knowledge of diseases, their causes, their conditions and their effects. We have painstakingly reviewed the various statements of the specialists and can do no more than conclude that the great preponderance of this medical testimony is to the effect that plaintiff was in good sound health, and, at the time of the accidental injury, free of any disease of the disabling kind which could have been accelerated or activated as a result of trauma. There is insufficient proof in the record to sustain in the slightest degree the contention of plaintiff. To this extent she has manifestly failed to discharge the burden of proof. We are convinced that there is certainly not sufficient evidence in the record to justify the conclusion that the judgment rendered below was manifestly erroneous.
In the case of Turner v. New Orleans Ice Cream Company, Inc., La.App., 154 So. 773, 775, we quoted with approval from Burgess v. American Safe Deposit Company, 19 La.App. 443, 445, 140 So. 103, 104, to the effect that, were we to substitute any conjecture of our own in the face of what appears the preponderance of medical opinion, we would be liable to err oftener than we do. In Landry v. Phoenix Utility Company, 14 La.App. 334, 124 So. 623, 625, we said: "* * * if we and our brother below have erred, the responsibility must rest with the medical profession and not the judiciary."
Having previously determined — which must be conceded — that plaintiff sustained an accidental fall and, as a consequence, suffered personal injury requiring medical care and hospitalization, the record convinces us that the disability resulting therefrom no longer existed as of date, December 30, 1939. It is shown that she was discharged from the hospital on October 24, 1939, and thereafter engaged in and pursued activities and pleasures enjoyed by a normal individual. From the date of her injury, September 27, 1939, to the date that she was pronounced physically fit to engage in work of a character similar to that which she was formerly engaged in, December 23, 1939, plaintiff admittedly received compensation from defendant. The record fails to disclose that she suffered any disability or inconvenience from that latter date, as claimed by her.
The lower court resolved its findings against plaintiff's contentions, and we find nothing to justify the conclusion that such findings were erroneous.
For the reasons assigned, it is ordered, adjudged and decreed that the judgment appealed from be, and it is hereby, affirmed.
Affirmed. *Page 148