This is a suit for compensation. The plaintiff, Marcelien L. Daigle, alleges that while employed by the Higgins Industries, Inc., an accident occurred on May 23, 1944, when he fell from a scaffold to the ground about seven feet below injuring both wrists, with the result that he is totally and permanently disabled. He sues his employer and its insurance carrier, the Maryland Casualty Company, claiming compensation for 400 weeks at $20 per week.
The defendants admit that the plaintiff was injured while in the employ of Higgins Industries, but contends that all compensation due him has been paid and that as a result of the accident he has an "ununited fragment of bone in his left wrist" which should be removed by surgical means; they aver that they have tendered the expense of such an operation and agreed to pay compensation for such time as plaintiff may be disabled during the operation.
There was judgment below in plaintiff's favor as prayed for subject to certain credits for compensation which plaintiff has received.
According to the argument and brief of counsel the position of defendants is that "plaintiff has clearly failed to establish his case with the certainty and exactness required by law". In support of their contention *Page 382 
reference is made to the confusion produced by the conflicting testimony of the medical experts or, to quote again from counsel, the "hopeless conflict of medical evidence as to whether the injury to the left wrist is healing or not". The right wrist, it is claimed, has healed.
The following doctors testified in the case. Drs. E.H. Maurer, J.N. Ane and Ernest Charles Samuel on behalf of the plaintiff; and Drs. John T. O'Ferrall, Louis Judson Bristow, Jr., and Max M. Greenburg on behalf of the defendant.
We quite agree concerning the differences and disagreements among the expert witnesses. There is in evidence sixteen X-ray negatives taken from time to time by various doctors, which have been variously interpreted by the experts.
Plaintiff, a white man weighing two hundred and twenty-five pounds and thirty-eight years of age, was employed by Higgins Industries as a "grinder". We learn from the record that a grinder's occupation consists in holding a pneumatic grinding machine, weighing fifteen pounds, and pressing it against the steel hull of vessels in order to smooth the surface. It was while thus engaged that a scaffold on which he was standing broke and precipitated him to the ground. In an effort to break his fall he stretched out his arms and injured his wrists. He was taken to the Hotel Dieu by the resident physician of his employer, Dr. Greenburg, where an X-ray was taken which indicated that his right wrist had sustained an "impacted comminuted colles fracture of the right radius extending into the joint space, with distal fragment displaced slightly to the exterior side." Dr. Greenburg found nothing wrong with his left wrist, though plaintiff complained of pain and swelling. About six weeks after the accident or, on July 16, 1944, plaintiff returned to work, He was given light work for a few weeks and then assigned to the job of grinder in the fabrication department, the difference between this occupation and his former one being that in the fabrication department he was not required to hold the grinding machine against the hull of vessels, but was able to place it on the flat surface of the steel plates.
Plaintiff testified that he continued to suffer constantly and, at least three times a week, went to defendant's clinic to have his wrists treated and baked. In this he is sustained by Bertrand Ribes, a sort of foreman for Higgins Industries. The plaintiff, however, continued to work, though in the beginning with some irregularity, until March 18, 1945, when he was discharged because of unsatisfactory service.
In the early part of April, plaintiff consulted Dr. Maurer, who caused some X-rays to be taken by Drs. Menville and Ane. Dr. Maurer, interpretating the pictures, testified as follows:
"Left hand presents a moderate degree of swelling on dorsal aspect, particularly near the wrist. Extension was only possible of the left wrist to an angle of 40 degrees. Flexion 80 degrees. Lateral motion was 60 per cent normal. Pain was elicited upon deep pressure over the anatomical snuff box and under the styloid process of the radius. The fingers were stiff and lacked flexibility and freedom of motion. There was an acute weakness of the thumb musculature, and he had lost the ability to make an 'O' when the tip of his index finger and the tip of his thumb meet. He could only adduct the thumb to where it reaches the base of the little finger by forcing it. The X-ray of the left hand showed a fracture of the scaphoid bone, which is ununited. This is a very complicated type of fracture, and if not treated correctly and early, the upper half of the bone will waste away, and it always creates a distinct possibility of traumatic arthritis resulting.
"Now, the right hand at that time showed a marked degree of swelling on the dorsum of the wrist. The motions of the right hand were 50% normal in an up and down direction, and in a lateral direction, normal. Grip in the hand was about 50% normal. The X-ray of this extremity showed a fracture, a complicated fracture of the lower end of the radius. I made a diagnosis of traumatic arthritis. At that time, his right wrist gave more trouble than his left."
Dr. Maurer was of opinion that the plaintiff was unable to perform manual labor because of the condition of his wrists. *Page 383 
Plaintiff then notified the defendant insurance company of Dr. Maurer's findings and they referred him to Dr. John T. O'Ferrall, who also caused X-rays to be taken on May 2, 1945, which confirmed the finding of Dr. Maurer concerning the ununited fracture of the carpal scaphoid of the left wrist.
[1] This suit was filed on May 16, 1945. On May 24, 1945, defendants offered to have an operation performed on plaintiff's wrist at their expense. This offer was refused and, after reading the medical testimony on the probable success of such an operation, we are convinced that plaintiff was justified in refusing to submit to it.
Dr. O'Ferrall, the leading expert for the defendant, who testified on two or three different occasions, was originally of the opinion that in sixty days time the plaintiff's left wrist would have sufficiently recovered to permit his returning to his work, whereupon defendants' counsel obtained a postponement of the trial for that period of time. Meanwhile additional X-rays were taken and Dr. O'Ferrall, when the hearing was resumed, stated that he was uncertain concerning the healing of the fracture, but agreed that "plaintiff could not do any very heavy work".
There is much other medical evidence chiefly concerned with the interpretation of the numerous X-ray pictures which is conflicting in many details, but all the doctors seem to agree that plaintiff's left wrist is not healed and in no condition to permit him to resume his former occupation as a "grinder".
There is some testimony concerning a previous injury to plaintiff's left wrist, but plaintiff's ability to discharge the functions of his occupation prior to his accident of May 23, 1944, does not seem to have been affected. Moreover, the evidence is to the effect that the previous injury was not to plaintiff's wrist, but to his thumb.
[2] On the whole, we believe the plaintiff has sufficiently established his claim of permanent total disability to discharge the functions of the occupation he was engaged in at the time of his injury, that is to say, as a grinder, and that, therefore, he should recover.
Defendants maintain that the lower court erred in not allowing a credit of $20 per week during the time the plaintiff worked after the accident because the wage received by plaintiff was in excess of that amount and only light work was required of him. They cite the cases of Hulo v. City of New Iberia, 153 La. 284, 95 So. 719; Carlino v. United States Fidelity Guaranty Co., 196 La. 400, 199 So. 228; and Vega v. Higgins Industries, Inc., La. App., 23 So.2d 66.
[3] The cases referred to establish the principle that where a workman, subsequently to his injury, is re-employed by his former employer at a full wage, although he does little or nothing to earn his pay, the employment being more or less a benevolence, that so much of the wage paid as equals the amount of compensation due the employee, must be considered as an offset, and the employer is entitled to a credit of that amount.
On the other hand, it is equally true that where the employee has been receiving an earned wage for work actually and reasonably well done, the amount paid cannot be credited against the compensation due. This has been held in many cases. The oft-quoted Carlino case is not to the contrary.
In Holliday v. Martin Veneer Company, La. App., 15 So.2d 168, 169, Holliday in suing for compensation conceded that there was due his employer as an off-set, credit for the number of weeks during which he had been re-employed after the accident. The Court of Appeal for the First Circuit held: "The defendant's contention that plaintiff has been overpaid what was due him as compensation cannot stand in view of the decisions of the Supreme Court on the question of an employee being paid regular wages by his employer for doing lighter work after he had been injured. The case of Stieffel v. Valentine Sugars, Inc.,188 La. 1091, 179 So. 6, is controlling on that point. The only thing which redounds to the kindliness or beneficence of the employer who thus favors an injured employee seems to be that that part of such wages paid by him which amount to the sum of compensation due during the periods *Page 384 
of employment, are deductible from the total amount of compensation that is recoverable. That as we view it, is the holding in the case of Carlino v. United States Fidelity 
Guarantee Co., 196 La. 400, 199 So. 228, 232, and seems to be authority therefore for the deductions made by the trial judge in this case."
In plaintiff's application for writ of certiorari he reversed his position and claimed that the amounts paid him during his reemployment constituted earnings and could not be considered in computing the amount of compensation due him. The Supreme Court, 206 La. 897, 20 So.2d 173, 174, after quoting the foregoing paragraph from the opinion of the Court of Appeal, said: —
"We think the court is in error in its appreciation of our holding in these two cases. The question of whether or not compensation due an employee during the period of his total permanent disability could be off-set by wages paid him for doing light work for his employer during such period was not an issue in the Valentine case, while in the Carlino case, where the employee sued his employer's insurer and not his employer, as here, we held that an employee was not entitled to recover compensation payments from his employer's insurer during the period he was being paid an unearned salary by such employer, but that the insurer could not be allowed to deduct as a credit against the compensation due the employee the amounts in excess of such compensation paid thus gratuitously by his employer.
"However, the plaintiff having alleged in his petition, and prayed accordingly, that the defendant is entitled to be credited with the compensation that had accrued during the periods of his re-employment by way of off-set against the wages received during such period, we are powerless to render a decision in his favor to the contrary. Articles 156 and 157 of the Code of Practice."
[4] The test, then, is whether the wage was intended as a gratuity or benevolence. Was Daigle re-employed through the "kindliness or beneficence" of the Higgins Company to do little or nothing for the wages paid him? The evidence is to the effect that he was discharged because he could not or would not perform his duties as well as his employer believed he should. In other words, his employment was not a gratuity, but on a quid pro quo basis and when he did not give what his employer considered to be value received, his employment was terminated. It is evident that under the jurisprudence no credit can be allowed for the wages paid plaintiff during his re-employment.
A stipulation agreed to by counsel for plaintiff and defendants was filed in this court and reads as follows:
"It is stipulated between plaintiff and defendants, through undersigned counsel, that the following is the situation with regard to payments of compensation by Maryland Casualty Company to plaintiff prior to the rendition of judgment in this cause:
"Compensation at the rate of Twenty 00/100 Dollars ........ ($20.00) per week was paid from May 30th, 1944 through July 8th, 1944, or a total of One Hundred Thirty-Six 67/100 Dollars ........ ($136.67). In addition, Daigle was paid (prior to the filing of suit) Thirty-Three 33/100 ....... ($33.33) covering various days on which he laid off or a total of One Hundred Seventy 00/100 Dollars ........ ($170.00) compensation paid prior to filing of suit.
"In addition, compensation for thirty-four (34) weeks (March 19th, 1945 through November 11th, 1945) was paid in a lump sum in an amount of Six Hundred Eighty 00/100 Dollars ........ ($680.00), plus interest up to the date of payment.
"In addition thereto, weekly compensation was paid for fourteen (14) weeks from November 12th, 1945 through February 17th, 1946, or a total of One (Two) Hundred Eighty 00/100 Dollars ........ ($180.00) ($280.00)."
This stipulation requires a slight amendment of the judgment appealed from, consequently, and
For the reasons assigned the judgment appealed from is amended so as to read as follows: "It is ordered, adjudged and decreed that there be judgment herein in *Page 385 
favor of plaintiff, Marcelien L. Daigle, and against the defendants, Higgins Industries, Inc., and Maryland Casualty Company, in solido, for workmen's compensation at the rate of $20.00 per week during the period of plaintiff's disability, not to exceed four hundred weeks, commencing May 23rd, 1944, subject to a first credit of $136.67 representing compensation paid from May 30th, 1944 through July 8th, 1944, plus $33.33 paid for the various days that plaintiff was unable to work during his re-employment; and a second credit of $680.00, plus interest, representing the compensation paid for the thirty-four weeks from March 19th, 1945 through November 11th, 1945; and a third credit of $280.00 representing weekly compensation paid for fourteen weeks from November 12th, 1945, through February 17th, 1946; the unpaid intervening installments to bear interest at the rate of 5% per annum from due date until paid." And as thus amended it is affirmed.
Amended and affirmed.