McBRIDE, Judge.
This is a suit brought under the workmen’s compensation law by Noel Johnson, colored, a freight handler, to recover compensation from his employer, W. L. Rich-eson & Sons, Inc., by whom he was employed on September 16,' 1948, on which date, during the course and scope of his employment, he met with an accident. The occurrence of the accident is admitted; plaintiff was engaged in moving barrels of asphalt, each weighing about 380 pounds, by handtruck on the wharf on the river front. At the time of the accident, rain was falling and the wharf was slippery; plaintiff slipped, his body going beneath his handtruck, and the load which he was moving fell upon him, causing certain admitted injuries.
Plaintiff claims compensation at the rate of $30.00 per week for the maximum period, on the allegation that he was totally and permanently disabled, plus $500.00 medical expenses, less a credit for the medical expenses already paid by the defendant.
The petition sets forth that plaintiff, while doing similar work, suffered a previous accident on January 27, 1941, in which he sustained a fracture at the base of the metatarsals of his left foot, and that he filed a suit for workman’s compensation arising out of said accident; that after that case had been partially tried he compromised his claim, on July 14, 1942, for the sum of $1572.18; that for some time thereafter he was unable to engage in any but limited activity, and could not resume the hard laborious work required of a longshoreman or freight handler, which is his usual occupation, until some time in the year 1945. Plaintiff made an alternative demand to the effect that if, for any reason, the court should find that his present condition was not caused solely as a result of the accident of September 16, 1948, then, and in that event, his disability resulted from an aggravation of the injuries sustained on January 27, 1941, and that the combination of the injuries received in both accidents, rendered him totally and permanently disabled from carrying on the duties of his occupation.
The sole defense addresses itself to the extent and duration of the disability. It is alleged in the answer that Johnson was fully able to return to work when discharged by defendant’s physician, and that he could have worked had he made the attempt to do so. It is also alleged that Johnson had been paid compensation at the rate of $26.00 per week from the accident to the date of the medical discharge. Defendant claims to have incurred, in medical expenses in having Johnson treated, the sum of $191.64.
After a trial in the court below, there was judgment in favor of plaintiff for 400 weeks compensation at the rate of $26.00 per week, subject to a credit of eleven weeks and four days, representing compensation already paid. The judgment also taxed as costs against the defendant a $50.00 expert fee to each of the two physicians who testified for plaintiff at the trial.
Defendant has perfected this appeal; plaintiff answered, praying that the weekly *194 compensation be increased to the amount of $30.00.
The extent of the education of plaintiff, who was 49 years of age at the time of the trial, was fifth grade in grammar school, and he has always done hard manual labor, his first occupation having been that of a farmer. For more than ten years he worked as a longshoreman or freight handler for various stevedoring and shipping companies. Johnson was in what is known as a labor pool on the river front, and worked for no particular employer. When a company required labor, it called upon the Union, which would send laborers to the company requesting manpower. Prior to the accident, Johnson had worked intermittently on call for the defendant for a period of two years.
As has been said before, Johnson had previously met with an accident on January 27, 1941, in which he injured the third, fourth, and fifth metatarsals of his left foot, and after his suit for compensation was compromised he went to the town of Bogalusa, where he bought a home. For a period of about four years plaintiff did not engage himself in the occupation of longshoreman or freight handler. Pie returned to that class of work in 1945. There is no question that after returning to the freight handling occupation in 1945 he carried out his duties to the full satisfaction of his employers. A Mr. Schlink, a clerk or supervisor in the employ of defendant, testified that he considered Johnson a good worker and would never have hired him if he had any doubt about his ability to do the work. I-Iis testimony regarding this feature of the case is worthy of quotation here:
“A. I have known Noel — I have worked him off and on for possibly a year and a half or two years.
“Q. Do you find him a good worker? A. I had no trouble with Noel.
“Q. He was O.K. ? A. He was O.K.
“Q. And you had no trouble with him? A. No.
“Q. Did he ever complain about his leg or his back? A. None that he told me.
“Q. Now, if he had not been physically able to do that work, would you have hired him? A. No, sir.”
After plaintiff fell on the slippery wharf, the truck and its load were lifted off him, and although he tried he could not continue with the work and had to “knock off.” He was referred to Dr. J. Kelly Stone, defendant’s physician, but when he arrived at the doctor’s office, to which he had been sent by taxicab, the office was closed, and he was not able to see the doctor until the following day, when he was taken in charge by Dr. Stone and X-ray plates were made by a Dr. Ane. The next day Dr. Stone concluded that Johnson had an injury to the left thumb, which was swollen; there was some evidence of a slight rigidity of the lumbar muscles, and also a chip fracture involving the superior surface of the astragalus of the left ankle, with separation of fragments. Five days after the accident a cast was applied to Johnson’s left foot and leg at the Flint-Goodridge Hospital. Thereafter, he visited Dr. Stone’s office regularly, and was provided with a crutch. The cast remained in place until October 15, 1948, and then for fifteen days or so Johnson received various types of physiotherapy, with applications of liniment and internal medication. Dr. Stone dismissed him on December 7, 1948. Johnson testified that his back still continued to ache, and that his left ankle pained him whenever he put his weight upon it.
After the discharge by Dr. Stone, Johnson went to the Charity Hospital in New Orleans, and the X-rays made there disclosed possible fractures of the left anlde and the back. Johnson was treated by the hospital physicians until March 29, 1949, his chart showing that on that date there was some improvement and he was discharged.
Plaintiff produced two medical experts. Dr. E. H. Maurer, an orthopedic surgeon, examined him on three occasions, viz., April 14, 1949, May 9, 1949, and November 17, 1949. Dr. Maurer, found that the plaintiff’s left leg and ankle were stiff, sore, and swollen, the ankle showing a marked degree of increased pigmentation *195 of the skin, and that the spine tilted slightly to the left, with evidence of pains in the back. The X-ray pictures showed an osteoarthritis of the spine aggravated by trauma, and a chip fracture involving the superior surface of the talus of the left foot; and there was a spur at the inferior surface of the heelbone. The X-ray plates also showed soft-tissue thickening and fibrosis about the ankle.
On the November 17, 1949, examination, Dr. Maurer found that the left leg showed atrophy. The circumference of the ankle joint was 1^4 inch increased, and in addition to the swelling there was a thickening of the tissues, with increased pigmentation about the anide.
Dr. Maurer examined plaintiff during the trial in the judge’s chambers in the presence of the judge and counsel. He made these remarks during the course of the examination: “You can notice the increased amount of pigmentation in and about the ankle. You can see the bony prominence in the right foot but not on the left foot. There is a marked degree of swelling in and about the ankle joint, the left ankle.”
The doctor said that: “The circumference of the left ankle is 1*4 inches greater than that of the right side. Now, the upward motions of the ankle joint: the left is one-quarter of the right. It is about 80 per cent normal, the downward motion. Now, the inward motion is about 80 per cent normal. The outward motion is about 25 per cent normal on the left side. Now, with this thickening existing for this length of time, you always get fibrositis. The normal tissues are displaced by nonelastic connective tissues. And this condition gets worse as it goes on. Your circulation is interfered with, nourishment is interefered with, and as time goes on, this thing will get worse.”
Dr. Maurer pointed out where the fracture was located, and stated that “the soft-tissue involvement is giving him most of the trouble.” He found one-half inch atrophy of the left leg as compared with the right. He was positive that the X-ray plates showed a chip fracture of the as-tragalus or talus on its superior distal part, and also the spur on the heel.
His conclusion was that the “back condition is an aggravated osteoarthritis of the spine. An ordinary layman can look at this ankle and see that it is swollen. You don’t even need a doctor to see that the man is disabled.”
Dr. William Fisher, a general surgeon, made an exmination on April 4, 1949, and also on the date of the trial. His findings were that the left ankle revealed odema or swelling, and that the patient complained of pain on weight bearing and on pressure to the region of the left heel and ankle. Dr. Fisher interpreted the X-ray plates taken both by Dr. Ane and at the Charity Hospital as showing the chip fracture of the talus, with a spur formation on the heel. He believed that Johnson’s complaints were consistent with the radiographic and clinical evidence of injury, and that there were present both objective as well as subjective symptoms. He measured the swelling of the ankle, and found a difference of one inch at the bony prominences between the left and right ankles. Like Dr. Maurer, his opinion was that the swelling was the result of soft-tissue damage.
Dr. Fisher’s conclusions were that plaintiff was incapable of performing the duties of a freight handler. He recommended surgery, with the reservation that it may not occasion improvement in the patient’s condition. He stated “maybe in one out of about four cases you may expect relief of pain and improvement.”
Dr. Stone, who is an industrial surgeon, in testifying for the defendant, stated that the swelling in Johnson’s left foot and ankle was apparent from a gross examination. He conceded that the swelling and discoloration indicated that the injury sustained was a fairly severe one.
Dr. Stone was evidently confused as to some details of the case. On direct examination he stated that at the time he dismissed Johnson there was no. evidence of objective symptoms. However, during cross-examination, upon a re-examination of his records, Dr. Stone stated that there was a swelling in the left ankle and foot. *196 He found in his examination in the judge’s chambers that plaintiff’s left foot and ankle were still swollen, and believed that the swelling was greater then than at the time he discharged Johnson.
Dr. George G. Battalora, an orthopedist, also appeared as a defense witness. It seems that at the time Johnson was under Dr. Stone’s care he was sent to Dr. Batta-lora for examination on November 16, 1948. Dr. Battalora found evidence of the chip fracture, which he said involved the superior surface of the left astragalus, with Some separation of the chip fragments. He also observed swelling about the left ankle, but no atrophy in the left calf muscles.
Dr. Battalora made another examination on June 13, 1949. Johnson still complained of pain in his left foot and his back, and tenderness was present over the fourth lumbar level. There was a puffiness about the left ankle, and the circumference of the calf of the left leg was less than the measurement of the right calf.
As did the other physicians, Dr. Batta-lora examined Johnson in the presence of the judge and counsel, and while he admitted that there was a moderate swelling in the left ankle, he made no measurement to determine its extent. The witness stated that the swelling and a limitation in dorsi-flexion were objective symptoms. Dr. Bat-talora stated that if he were called upon to examine the plaintiff for a job, he would refuse to certify him until the swelling in the ankle was eliminated.
Both of the defendant’s physicians believed that the persistent swelling in the ankle resulted from the lack of activity on the part of the plaintiff, and that if he had attempted to return to work, as instructed by Dr. Stone, the exercise would have eliminated the condition.
However, neither Dr. Stone nor Dr. Bat-talora was willing to class the plaintiff as a malingerer. The former stated that while under treatment Johnson was cooperative and reported for treatment regularly.
Defendant’s counsel argues that plaintiff is to blame for his present condition, because of inactivity, and that if he had returned to work the disability would have been dissipated.
There is considerable authority to the effect that where an injured workman’s unreasonable inactivity, or his unjustified failure to cooperate in the treatment recommended by the physicians, retards his recovery or prolongs his disability, he cannot recover compensation beyond the period that would have been necessary for his recovery had he properly cooperated. But we do not think that this doctrine, howsoever sound, should be applied in the instant case. Johnson steadfastly insisted that the pain was of such severity that he could not work. The evidence discloses, and it is as well a matter of common knowledge, that the duties of a longshoreman require hard physical labor by able-bodied men, and it would be stretching the above doctrine too far if it is to be said that Johnson, in spite of his pain, should have abided by Dr. Stone’s instructions to return to the strenuous duties of his occupation.
Our Supreme Court, in the case of Stieffel v. Valentine Sugars, Inc., 188 La. 1091, 179 So. 6, 15, said: “‘Competency,’ accompanied by active pain, amounts to disability.”
Significant is the fact that upon his discharge by Dr. Stone the plaintiff still suffered pain to such an extent that he sought treatment from another source. Almost immediately upon his medical discharge, Johnson visited the Charity Hospital and was treated there from time to time until March of 1949, or for a period of about three months. This course of conduct on Johnson’s part indicates to our minds that his complaints were genuine.
It has not been shown that Johnson remained entirely inactive. He rents rooms in his house in Bogalusa, and engages in sweeping the floors and other household duties. On one or two occasions, he climbed a ladder to the roof and repaired the tar paper.
In one respect, it is difficult to reconcile the testimony of Dr. Stone with that of Dr. Battalora. The former conceded that when he discharged Johnson there was a *197 swelling in the ankle, bu-t nonetheless he advised Johnson to return to his occupation, because he believed that the exercise would be beneficial to the patient. On the other hand, Dr. Battalora stated that if he were called upon to pass on plaintiff’s physical capacity for doing the work, he would not approve him until the swelling went down.
After carefully studying the record as a whole, we readily conclude that plaintiff, at the time of the trial below, was totally disabled, and incapable of performing the manual labor required of one engaged in the occupation of freight handler.
A feature of the case which impresses us greatly is that all four medical experts examined Johnson in the presence of the court, and pointed out the various aspects of their findings. The trial judge was in a superior position to weigh and evaluate the testimony, especially in view of the fact that he had the opportunity, which was of inestimable value, to observe the physicians’ examinations as they progressed, and to determine from his own observations the weight to be accorded the testimony. He found for plaintiff, and correctly so.
A great portion of the oral arguments of counsel before us was devoted to the proposition whether the present incapacity of plaintiff resulted from the prior accident of January 27, 1941. Appellant’s counsel insisted that Johnson is an experienced compensation claimant, the present case involving his third claim for compensation. The record does not bear that out. We find no evidence that Johnson ever made three compensation claims. He admitted that many years ago certain of his right toes were mashed while working for a stevedore, the injuries incapacitating him for about eight weeks, but he stated that he never made claim for compensation, and his assertion is not challenged by any other evidence before us.
Another interesting circumstance is that both Dr. Battalora, who appeared for the defendant, and Dr. Maurer, one of plaintiff’s experts, testified as experts in the former compensation suit growing out of the accident of January 27, 1941. We are convinced that whatever injuries befell plaintiff in said accident were to the third, fourth, and fifth metatarsals of the left foot, and that the ankle was in nowise involved. Neither of defendant’s physicians testified that the present disability resulted from the 1941 accident, or that the injuries sustained in that accident had anything to do with Johnson’s present condition. Dr. Stone frankly stated that when he treated Johnson he could discern no injuries to the metatarsals, as those bones were not involved, and the X-rays showed the injury to the astragalus to be “new.”
;The record in the previous compensation suit was not introduced in evidence in this case, but nevertheless defendant’s counsel argues that in that suit plaintiff made the allegation that he was totally and permanently disabled by reason of the metatarsal injuries, and that those injuries were in existence up to the time of Johnson’s accident on September 16, 1948. This argument is without foundation, and it seems to us that the testimony of Mr. Schlink, defendant’s clerk or supervisor, would absolutely refute it. According to Mr. Schlink, after returning to work in 1945 Johnson was employed intermittently by defendant, and his services were always found to be entirely satisfactory, and defendant’s agent had no fault to find with the manner in which he performed his duties. Moreover, the compromise of $1572.18, confected between plaintiff and his employer in 1942, negatives any thought that the plaintiff was totally and permanently disabled at that time. It cannot be overlooked that the compromise was entered into after the case had been partially tried and medical testimony had gone before the court, and the fact that the trial judge approved the compromise of $1572.1S would of itself demonstrate that Johnson was not totally and permanently disabled. We cannot believe that the judge would have approved the settlement if the evidence showed there was a total and permanent disability.
 Now passing to the answer to the appeal in whch plaintiff prays that the rate of compensation be increased to $30.00 per week, we find that between January and *198 September of 1948 plaintiff earned, while working for defendant, a grand total of $305.19. Some weeks during that period Johnson made as little as $15.00. In support of their prayer for the increase plaintiff’s counsel argue that the criterion to be used in fixing the amount of compensation to be paid by defendant is plaintiff’s daily wage, regardless of the amount of his actual weekly earnings. We believe this to be correct.
It is well settled that under the workmen’s compensation act, as amended, the rate of compensation allowed an injured workman is no longer to be based upon his average weekly wages, but upon his daily rate of pay. Rylander v. T. Smith & Sons, 177 La. 716, 149 So. 434; Bolden v. Plant Line Stevedorng Co., Inc., La.App., 169 So. 189; Mertz v. Von Schlemmer, La.App., 13 So.2d 133. It is conceded that when plaintiff worked he was paid $1.30 per hour, and that for a full eight-hour day he would receive $10.40. The record does not show whether freight handlers in the employ of defendant work a five- or six-day week, but even under the present day scheme prevailing in many industries, that employees work forty hours per week, or five days, the plaintiff’s weekly wage would have been $52.00, or sufficient to entitle him to $30.00 per week compensation, and, therefore, the rate should be increased to that figure.
Appellant also advances the argument that if Johnson is entitled to compensation the judgment should not be predicated on the theory that he is permanently. disabled. Counsel points to the testimony of the defendant’s experts, that the swelling about the left ankle resulted solely from Johnson’s failure to use his leg, and that the swelling could be eliminated in a short period of time. Counsel endeavors to persuade us that the claimant should only be allowed compensation to the date of the trial in the lower court, plus possibly a few weeks, in the court’s discretion, during which time the physicians could bring him back into such a condition as would permit of his returning to work.
The alternative argument is made that at best the plaintiff is entitled to be classed as a partially disabled laborer, as he is physically able to do and perform other work of a reasonable character and can pursue gainful employment.
No statement whatever emanated from defendant’s experts as to the period within which the swelling in plaintiff’s ankle should recede to such an extent that he could carry on his duties, and in the absence of such a showing it would be impossible to fix any particular time during which the compensation is to run. The judgment in plaintiff’s favor is for compensation for a period not exceeding the maximum of 400 weeks, and in light of the testimony this is the only possible judgment which could have been entered.
Act 20 of 1914, § 20, as amended, now LSA-R.S. 23:1331, provides an adequate remedy for an employer situated in the position in which the defendant finds itself. The pertinent portion of § 20 reads as follows: “At any time six months after the rendition of a judgment of compensation, a judge of the trial court that rendered the judgment shall review the same upon the application of either party for a modification thereof, on the grounds that the incapacity of the employee has been subsequently diminished or increased, or that the judgment was obtained through error, fraud, or misrepresentation. * * ”
If in the future the defendant has reason to believe that Johnson has recovered, or that his incapacity has diminished, it can avail itself of the remedy and course provided by the above quoted portion of the act.
The argument that Johnson should be characterized as partially disabled because he might do some other kind of work is fully answered by the well established jurisprudence of this state, to the effect that the phrase “work of any reasonable character,” as appears in the workmen’s compensation statute, means that the test of an injured workman’s disability is whether he can return to the same or similar occupation in which he was engaged at the time of the accident which caused the disability. The fact that the workman might be capable of pursuing a less arduous *199 employment is to be given no consideration.
Appellant makes no complaint regarding the allowance of the fees to plaintiff’s expert witnesses.
For the reasons assigned, the judgment appealed from is amended, so as to increase the amount of compensation to $30.-00 per week, and as thus amended, and in all other respects, the judgment is affirmed.
Amended and affirmed.