Plaintiff in this case suffered an accidental injury on August 16, 1943 for which he instituted this suit to recover compensation from the defendants, his employer and the latter's compensation insurance carrier, for the maximum amount of compensation for total, permanent disability.
He was employed as a bookkeeper and office manager by the defendant lumber company but the testimony shows positively that he also had other duties to perform which took him outside of the office, principally to tend a gasoline filling station situated some twelve feet from the door of the building in which his office was located. Besides he had to deliver messages and orders to the sawyer at the saw mill. This latter part of his work necessitated his walking a considerable distance from the office to near the saw mill where he either wrote or posted the orders on a blackboard attached to a post near the mill.
[1] Therefore, considering the different things he had to do, there cannot be much doubt that under the jurisprudence of this State, plaintiff's duties in connection with his employment were of a hazardous nature and the important question is whether or not he was engaged in the performance of any of the hazardous duties of his employment at the time he was injured.
The undisputed facts concerning the accident are as follows:
Plaintiff was sitting at his desk, engaged at the moment in some of his clerical duties, when he heard a noise on the outside of the office building which sounded to him like a pistol shot. He went to the window and looked out and as he saw a truck in motion at the time he thought that the noise was caused from a backfire of the motor. He apparently paid no further attention to what had happened until a negro came in and told him that a telephone wire had broken and was wrapped around the high powered line which paralleled it. He then went to the outside and saw that the line was broken. He would have called someone whose business it was to do so, to come and repair it, but the telephone in his office had gone dead; so considering it part of his duty to warn anyone of the danger that might exist, he sat down in a chair in the door of the office where he could be on the lookout for traffic that might come in contact with the wire. He remained there for about thirty minutes and then took it upon himself to do something about the situation. He looked to see if the high powered wire was insulated and also asked the negro if he thought it was. Apparently satisfied that it was, he caught hold of the hanging wire, pulled on it a couple of time and was unable to get it loose. He then stepped back two or three paces at an angle to pull on it again and on doing so he was knocked unconscious by an electric shock which he sustained and from the result of which he suffered burns to his hand and back and on the bottom of his right foot.
He was taken to a doctor to be examined and was placed on compensation immediately, receiving payments regularly until February 2, 1944, on which day he returned to limited employment with the defendant and was paid $20.00 per week until March 23, 1944. Payments made for this limited employment were thereafter increased to $25.00 per week and he again received subsequent increases whenever the other employees of defendant obtained raises in pay. On the day of the trial of the case he was still receiving such payments.
As a result of these payments the defendant, after suit was instituted, filed a plea of prematurity and exceptions of no cause or right of action. Very little testimony was taken on this plea and on these exceptions which disclosed facts regarding payments made by the defendant as just outlined and on the authority of the case of Thornton v. E. I. DuPont De Nemours Co., 207 La. 239, 21 So.2d 46, they were overruled. *Page 348 
The other defenses raised on the merits were rejected by the trial judge who awarded compensation for total, permanent disability at the maximum rate, payments to begin on September 10, 1945. The defendant appealed. As the exceptions and the plea which had been overruled do not seem to be urged on the appeal we do not find it necessary to refer to them.
Most of the brief of counsel for the defendant is devoted to the question of the nature of the accident and its relation to the plaintiff in connection with the duties of his employment. The point is strongly stressed that the plaintiff was not engaged in a hazardous employment under the provisions of the compensation law. Counsel seem to rely strongly on the case of Brownfield v. Southern Amusement Co., 196 La. 73, 198 So. 656, and also on the case of Brown v. Toler, La. App., 19 So.2d 680. In both these cases it was held that where an employer's business partakes of both the hazardous and non-hazardous features of the compensation act, an employee, in order to recover compensation when injured, must show that the major portion of his duties brought him in contact with the hazardous feature of the employment. In the Brownfield case, the plaintiff was injured when she fell off of a high stool at the ticket window of a moving picture theater of which she was manager and it was held that even though she occasionally used her automobile in connection with other of her duties, the work she was performing at the time of her injury was so remote from that part of her work which required her to use her car, it could not be said to have any possible connection with it and therefore compensation was denied. In the Brown case it was held that an employee who was engaged by a storekeeper and who was injured when he was opening oysters, while in the course of his employment, could not recover from the employer on the ground that in connection with his business the employer also used an electrically driven meat grinder which the injured employee also occasionally operated.
Several other cases are also referred to by counsel for defendant but all of them were decided on the particular facts involved in each, as indeed all of these cases have to be.
In the present case there can be no doubt that under the testimony the plaintiff's duties were not restricted to the simple matter of working in an office and keeping books and clerical accounts. It is urged that the filling station which he attended was defendant's private station but that would make no difference even if it were so. The facts do show however that occasionally gasoline was sold and served to strangers. Besides that, his duties in delivering orders to the saw mill certainly took him outside of the office and that also could be said to have had some connection with the hazardous features of his employer's business.
The crucial point therefore is whether his attending to that broken wire at the moment he was injured had any connection with the hazardous features of his employment and which may be said to have brought him under the protection of the compensation law.
[2] We believe that the district judge was correct in holding that there was some relation in the act he performed, to his general duties. That dangling wire was a potential source of danger to his employer's business as long as it remained hanging there. It was right near the employer's office building and was very close to the filling station where his trucks had to pass. As a matter of fact it was one of his trucks, as we understand it, which caused it to break. Plaintiff's duties as bookkeeper and office manager necessarily had some connection with his use of the telephone system which in this case was a private one belonging to the defendant. The testimony fairly shows that it was part of the plaintiff's duty to see that the system was kept in operation. He realized the danger that might be involved in the hanging wire and he also appreciated the importance of keeping the telephone in operation as well as the importance of removing the danger which no doubt impeded the progress of his employer's business as long as it remained unrepaired. He had no way of notifying those who could have repaired *Page 349 
it as the phone was out of order so he stood guard waiting on someone to come. No one having appeared at the end of thirty minutes, he then undertook to remove the danger himself by pulling on the wire. In doing this he had in mind the interest of his employer and did what he thought he should have done in the course of his employment.
[3] We do not believe that in attending to this broken wire plaintiff neglected any of the duties that were assigned to him nor do we think that he unnecessarily exposed himself to the danger involved in a wire loaded with electricity. The telephone was a necessary part of his office equipment and as the manager of that office it was part of his duties to see that it was kept in operation. He appreciated that there might be some danger in handling the wire but he endeavored to make sure that he could touch it by finding out first if it was insulated or not. That he was right in his own surmise that there was no danger is shown by the fact that he pulled on it twice and did not sustain any shock. In this connection we might also state that we cannot agree with counsel for defendant that his act was a foolhardy one and that his resulting injury was due to something uncalled for on his part.
[4, 5] On the point whether his injury arose out of the scope and within the course of his employment, one of the older cases is that of Kern v. Southport Mill, 174 La. 432, 434,141 So. 19, and it is often referred to as the leading case on that point. The test laid down can be said to be twofold. It must be determined first whether the employee at the time of the accident was engaged about the employer's business and not merely pursuing his own business or pleasure, and second, did the necessity of the employer's business reasonably require the employee to be at the place of the accident at the time it happened. Applying that test we believe that plaintiff's accident and injury in this case meets it on both points. Certainly he was interested in his employer's business at the time and by no means can it be said that he was pursuing any business or pleasure of his own for it can hardly be said that a man would try to remove a potential danger which may involve his fellow-employees or his employer's business merely to indulge a private pleasure or whim. We believe too that it can be said that the necessity of his employer's business did reasonably require him to be at the place of the accident and therefore, as we conclude, he was engaged in the course and scope of his employment at the time the accident happened.
The next point urged by the defendant relates to the nature and extent of the plaintiff's injuries and whether his alleged disability is one which prevents him from performing his usual work or work of a reasonable character within the meaning of the compensation law, after April, 1944, when he had been discharged by the doctor. That the plaintiff received a serious shock there is no doubt. Dr. Charles W. Lewis who saw him and treated him at the Eunice Clinic where he was taken after the accident, describes his condition when he was taken there, and also the reaction it had on his nervous system. As a result of electricity passing through his body his chest was affected and it was necessary to watch the effect on his lungs. Apparently there were no bad results from this and after keeping him at the hospital a couple of days he let him go home where he had to stay in bed because of the shock and the burns on the bottom of his foot where the electricity passed out of his body. That burn seems to be the only effect which remains and on its severity depends the question of the extent of plaintiff's disability.
According to the doctor, the damaging effect in a case of this kind is to the blood vessels, nerves and lymphatics. The circulation around the injured and damaged part seems to be impaired and that is principally what causes trouble. He treated plaintiff's foot and did all that he could for him until March, 1944 but says that it had not greatly improved and that if he would use the foot to any extent, that its use would cause pain. The use apparently causes swelling of the foot and that is what brings on the pain. In his opinion the plaintiff is disabled as, he testified, that if he was to be presented to him *Page 350 
for industrial examination, he would not pass him.
[6] Great stress is laid upon the fact that plaintiff's duties are essentially those of bookkeeper and office manager and therefore he does not have to use his foot to any extent to perform the services required of him. Even if that were so, we doubt seriously that he would not be entitled to recover because, to perform that work, he says he suffers pain and the jurisprudence is to the effect that no one is called on to perform work while suffering pain in order to recover compensation. As we read and interpret the testimony of the employer in this case, he kept plaintiff on the job as a matter of self-defense because he could not get anyone to replace him. He understands full well that he is paying him wages far more than he is actually earning as plaintiff certainly is not doing all of the work and performing all of the duties he did before he was injured.
[7] Counsel for defendant seriously contend that even though plaintiff is entitled to recover some compensation he should not recover as for total and permanent disability but should be restricted to one of those provisions of the compensation law which limits compensation on a proportionate basis for partial loss of the use of a member. Those provisions are found in subsec. 1(d), Pars. 15 and 16 of Sec. 8 of the compensation statute, Act 20 of 1914 and its amendments, Act No. 242 of 1928, p. 358. In the case of Stieffel v. Valentine Sugars, Inc., 188 La. 1091, 179 So. 6, this court had based its decision on the provisions of Par. 16 having held that the usefulness of a physical function had been seriously impaired by the injury but had not affected the capacity of the employee to work and earn a livelihood. The Supreme Court however reversed that decision and awarded compensation for total permanent disability. That case, in our opinion, is a great deal similiar to the case now before us and our decision is greatly controlled by it on nearly all the points that are involved.
As we hold the defendants liable for the maximum amount of compensation, the next question to decide is the extent of credit to which they are entitled.
[8] The district judge awarded compensation for 400 weeks beginning September 10, 1945, subject to a credit of $474.00. This credit represents the amount of actual compensation paid from August 16, 1943, the date plaintiff was injured to February 2, 1944, when such payments ceased and plaintiff was placed on limited employment. There is no mention of the date September 10, 1945, in the record but we understand that that is the date on which plaintiff's employment with the defendant lumber company was terminated. There is no basis in the record on which to fix that date as one on which to determine the compensation that is due, and moreover the judgment does not take into account this further credit defendants are entitled to, to the extent that the wages paid plaintiff for performing limited work, amounted to the compensation that was due him during that period. For as many weeks as he was paid after being placed on lighter duty after February 2, 1944, defendants are entitled to further credit. It is shown that he was receiving such wages at the time this case was being tried and the credit extends for as long a period as he remained so employed thereafter. In that respect, the judgment will have to be amended.
For the reasons stated it is now ordered that the judgment appealed from be amended by decreeing that in addition to the compensation actually paid plaintiff from the date of his injury to February 2, 1944 when he was placed on limited employment, defendants are entitled to further credit at the rate of $20.00 per week for as many weeks as he was kept on such employment, the total number of weeks of compensation however, not to exceed 400 weeks, and in all other respects the judgment is affirmed. *Page 351