CAVANAUGH, Judge.
Plaintiff sues the defendant for compensation for total disability under the Employer’s Liability Act, LSA-R.S. 23:1221, paragraph (2), subpart B for the sum of $19,-200, representing compensation at the rate of $48 per week beginning as of December 18, 1951, plus additional weeks for those weeks in which he worked and performed full services and less those weeks for which compensation has been paid; and for the further and additional sum of $500 in medical expenses and additional amounts as authorized by the defendant.
He alleges in his petition that he had been employed by the defendant for approximately seven years at its plant in Ville Platte, Evangeline Parish, Louisiana, and on or about December 18, 1951, he sustained severe back injuries in an accident occurring on the premises of the plant in Evangeline Parish; that he was able to continue his duties, but with increasing pain and distress, until about May 5, 1952, when, due to the severe pain resulting from the • aforesaid accident, he was forced to desist from his duties and was unable to perform any duties whatsoever until November 20, 1952; that his condition was diagnosed as lumbosacral sprain or strain and a traumatic back injury, but in an effort to reach a diagnosis from doctors was also diagnosed as a concurrent condition of prostatitis or a hypertension; that during this period he was unable to perform any duties whatsoever even of the lighter sort; that on November 20, 1952, he was released by the appropriate physician to return to work at the carbon company and to perform light duties and that since that date he has been performing duties as a welder’s helper, which he is able to perform only with the welder’s help and by wearing a truss; that he desires to earn his living and sup *391 port his wife and four children at no matter what suffering to himself and that it is his intention to do his duties to the best ability and to continue his employment at Cabot Carbon Company, Inc. so long as his physical condition permits; that in addition under the terms of an agreement with the Cabot Carbon Company Local, of the International Chemical Workers, in full force and effect on December 18, 1951, the Cabot Carbon Company Inc. has agreed to pay compensation at the rate of $48 during disability to any employee injured in the course of their employment; the additional $18 is claimed because of a special agreement between plaintiff and defendant under a union contract.
The suit was filed on December 17, 1952.
The defense to the suit is a general denial, except defendant admitted the employment of plaintiff and affirmatively alleges that if plaintiff has a condition which renders him unable to do work which he was performing on December 18, 1951, or work of a similar character, such condition had no connection whatever with plaintiff’s •employment and with any accident happening while in the course and scope of his employment by defendant. It affirmatively averred that the plaintiff had never been disabled to perform his work with defendant as a result of any accident arising out of and in the course and scope of his employment by defendant. It prayed that plaintiff’s demands be rejected -and this his suit be dismissed.
On April 20, 1953, the plaintiff filed an amended petition and alleged that because of his poverty and lack of means he was unable to pay the present cost or future cost incurred in the litigation or to give bond for costs and upon a proper showing obtained from the Judge an order to prosecute the suit in forma pauperis. On May 8, 1953, plaintiff filed an amended petition in which he claimed attorney’s fees. To this amended petition the defendant filed an exception of no right or cause of action and then filed an answer to said amended petition. On June 19, 1953, plaintiff filed a motion and obtained an order for a writ of subpoena duces tecum ordering the defendant to produce in open court on June 23, 1953, copies of letters and inter-office correspondence between defendant and its excess insurer as well as reports of all medical examinations and other letters and documents relating to the injury and disability claimed to have been suffered by plaintiff while in defendant’s employ.
A trial of the case was commenced on June 23, 1953, and was concluded on June 26, 1953, subject to the taking of the depositions of Dr. James Gilly, Dr. Theodore Simon, Dr. T. E. Banks, Dr. Dean H. Echols, Dr. Thomas Latolais and. Dr. Charles Frederick. It was subsequently agreed that a report of Dr. Latolais, dated February 3, 1953, be introduced in evidence and that he would testify to the facts therein recited.
The evidence of Dr. T. E. Banks of Alexandria was taken on September 2, 1953; that of Dr. Dean H. Echols on October 30, 1953; of Dr. C. O. Frederick on November 5, 1953; that of Dr. James Gilly on October 15, 1953; and that of Dr. H. Theodore Simon on October 30, 1953.
The transcript in this case consists of 339 pages, and from page 42 to 302 is found the notes of evidence. Dr. Reed Fontenot, Dr. R. E. Dupre, Dr.' T. E. Banks, Dr. Dean H. Echols and Dr. C. O. Frederick gave testimony for the plaintiff, and Dr. James Gilly and Dr. H. Theodore Simon gave testimony for defendant. In addition to the five medical experts testifying for the plaintiff, he also summonsed thirteen of his co-employees as witnesses, each of whom gave cumulative testimony for plaintiff’to the effect that'he couldn’t perform his work as well after he returned to work on November 20, 1952. The District Judge, after hearing these nine witnesses, maintained defendant’s objection to calling any more to give the same type of evidence. At the conclusion .of the testimony on the trial of the 'case and before the1 deposition of any of the experts was taken, the defendant filed a plea of prescription or peremption of one year to the plaintiff’s demand for *392 compensation. Arguments and briefs were filed in behalf of each of the parties, and, on July 30, 1953, the court, for reasons orally assigned, overruled the plea of prescription.
The case was argued and submitted on briefs in the lower court on February 19, 1954, and on March 26, 1954, the District Judge handed down written reasons for his judgment in favor of plaintiff for total disability benefits, and a formal judgment was read- and signed on April 9, 1954.
From the judgment the defendant has appealed and contends here that the Trial Court erred in not sustaining the plea of peremption of one year; and that if the judgment was not erroneous in overruling the plea of peremption of one year, that it was erroneous in awarding the plaintiff permanent and total disability, when the evidence showed that he could do and perform the same type and character of work he was performing at the time of the alleged accident.
We will first, consider here the plea of peremption of one year, - because if it is sustained under the facts,, plaintiff’s right of action is barred, and a consideration of the question of whether or not his injuries have produced total disability to do work of a reasonable character is not necessary.
From the petition of plaintiff hereinabove quoted, it is observed that he alleges he was injured on December 18, 1951, and that he was able to continue his work with increasing pain and distress until May 5, 1952, and that, his condition was diagnosed as lum-bosacral strain.
The evidence contained in the record shows that plaintiff, on December 12, 1951, while engaged in pushing a two-wheel wagon cart containing a barrel of oil half or three-quarters full, pushed the cart against a concrete sidewalk, one wheel striking the pavement causing the handles with which he was pushing the cart to jerk to the side and which he claims produced a crick or strain in his back, causing the injuries complained of. He did not think they were serious, and he continued to work, although he claimed he did not do any lifting that day. He reported the occurrence of the accident to his foreman, Olipsey LaFleur, on December 18, 1951. He made out an accident report to the defendant. -The plaintiff, after experiencing the accident on December 12th, reported to his personal physician, Dr. R. E. Dupre, on December 15th, who examined him and prescribed a lumbosacral belt and who referred him to Dr. Reed Fontenot. The defendant had notice of this accident, and, on December 15, issued its authorization to plaintiff to see Dr. Dupre for examination and on December 18, 1951, issued its authorization for plaintiff to see Dr. Reed Fontenot. The plaintiff continued to do his regular work following the accident, although suffering pain and discomfort which he said at some time became almost unbearable, yet no claim was made for compensation against the defendant. Dr. Reed Fontenot saw the plaintiff three or four times between December - 21, 1951 and March 9, 1952. He diagnosed his disability as the result of a lumbosacral strain. Plaintiff continued in defendant’s employ until about June 5, 1952, when he decided he was sick and could not do the work any more and wanted to take sick leave or time off from his work. He, in company with his foreman, approached the superintendent of defendant company and requested authorization to be examined or treated by a physician. This authorization was not given, but plaintiff was directed to consult his own private physician and was informed that the defendant did not provide a physician unless an employee had experienced an industrial accident on the job. This is made evident by the letter of Ray T. Owen, dated June 6, 1952, to Mr. Don M. Conley, Safety and Insurance Department, Pampa, Texas, which reads as follows:
“On June 5, 1952, Joseph ‘Buck’ Johnson, accompanied by his foreman, Olipsey LaFleur, came into the office and inquired about an authorization slip for medical examination. As there was some question on the matter they were referred to me. Olipsey and Buck came into my office. Olipsey said that *393 Buck had approached him saying that he wanted to go home; he said he was sick and did not feel like working. Also he wanted to know if he could have a slip to go to the doctor. Olipsey said that after questioning Buck to some length about the nature of his sickness and Buck said that he had not hurt himself, he felt sure that we would not issue a slip, but to be sure he would bring Buck to the office for final decision.
“In the presence of Olipsey I questioned Buck to some length. I asked him if he had injured himself while performing his duties, and he said ‘No’, he had not injured himself but he was feeling so bad that he just did not feel like working. I told him that we did not expect him to work if he was feeling too bad but that we could not issue a slip for an examination because we only issue those in cases of on-the-job injuries, but that he would be eligible for benefits under the insurance policy which cover, sickness. I suggested that he see a doctor as a private patient and then stay at home until he felt that he was able to return and do the work that his job required him.
“At approximately 11:00 am, he left the job.”
Despite this letter, the defendant, on June 18, 1952, had this plaintiff examined by Dr. H. Theodore Simon for the purpose of determining whether he had an industrial accident at that time or not, and it was this physician’s opinion that he was recovering from a lumbosacral strain, the same condition diagnosed by Dr. Reed Fontenot on his first examination on December 21, 1951, as well as by Dr. Dupre, plaintiff’s family physician.
After plaintiff experienced the pain on the date of the accident, December 12, 1951, and after being administered to and treated by Drs. Dupre and Fontenot and fitted with a lumbosacral belt, he continued to do and perform his work, although he claims that he could not do the heavy work or do it as well as he could before he suffered the strain, and his petition alleges and the evidence adduced in support thereof support his contention that he worked in pain from the time of the accident until he left the employ of defendant on June 5, 1952.
The defendant and plaintiff in the plea of peremption contends that the injury and disability developed on the happening of the accident on December 12, 1951, and was continuous because it had manifested itself and plaintiff had sought medical aid and continued to do his work, although totally disabled from the effects of the accident and injury; that he knew about it and made no claim for compensation, not even at the time he -left its. employ. The plaintiff and defendant in the plea contends that the peremption period invoked against him did not commence to run until the disability reached the state where he could not follow his usual work; that the payment to him of sick benefits under the insurance contract interrupted the running of the peremption.
The statute under'which the plea is authorized is as follows:
“In case of personal injury (including death resulting therefrom) all claims for payments shall be forever barred unless within one year after the accident or death the parties have agreed upon the payments to be made under this Chapter of unless within one year after the accident proceedings have been begun as provided in Parts III and IV of this Chapter. Where such payments have been made in any case, the limitation shall not take effect until the expiration of one year from the time of making the last payment. Also, where the injury does not result at the time of, or develop immediately after the accident, the limitation shall not take effect, until the expiration' of one year from the time the injury develops, but in all such cases the claim for payment shall be forever barredl unless the proceedings have been begun within two years from’the date of the "accident.” LSA-R.S. 23:1209.
*394 The Lower Court overruled the plea because it found under the evidence that a misdiagnosis of plaintiff’s disabling condition had been made on the first examination and that it was not rightly determined until some time in July, 1952, that the plaintiff suffered a more serious accident and'disability than -had been first determined, and based his decision for overruling the plea of peremption on the case of Mottet v. Libbey-Owens-Ford Glass Company, 1952, 220 La. 653, 57 So.2d 218, and Morgan v. Rust Engineering Company, La.App., 1951, 52 So.2d 86. Unless the facts in this case can be differentiated from the facts in the case of Mottet v. Libbey-Owens-Ford Glass Company, supra, the ruling of the Trial Court would be correct. He makes this statement in assigning as his reasons for overruling the plea of peremption:
“It might be well for the Trial Court to discuss defendant’s plea of prescription which was overruled for the reasons orally assigned for the benefit of the Appellate Court. The accident occurred on December 12th, 1951; the suit was filed on December 17, 1952, while plaintiff was still working for defendant, apparently under the impression that the injury had been sustained on December 18th, 1951, but in the suit it was alleged that the results of the injury had not manifested themselves until May of 1952. Plaintiff ceased work on June 5th, 1952, and the cause of his disability was at first erroneously diagnosed as ‘prostatitis’ and ‘neuritis’.
“In overruling the plea the Court followed the holding in Morgan v. Rust Engineering [Co.], [La.App.], 52 So.2d 86, and in Mottet v. Libb[ey]-Owens-Ford Glass Company, 220 La. 653, 57 So.2d 218. It is my opinion that the rule applied in the Mottet case was sufficient authority for overruling the plea of prescription, but beyond that, without considering the Mottet case, the Court felt that because of this original misdiagnosis, the one year prescription period did not begin to accrue until approximately July 30th, 1952, when it was determined by the company physician that the'prostatitis condition was cleared and that due to the remaining pain, that he concluded the disability was due to traumatic lumbosacral back strain.
“Moreover, ruling in the Mottet case is peculiarly applicable here because in that case, it was held that as to an employee who keeps on working following the accident, with gradually increasing pain, the one year prescription does not commence to accrue until he actually leaves his job, because it is impossible otherwise to ascertain when the non-disabling trauma developed into total disability.”
An analysis of the pertinent medical evidence is necessary to determine whether or not there was a misdiagnosis.
Dr. R. E. Dupre was the first physician to see the plaintiff after he suffered the accident which he contends produced his disability. Plaintiff reported to Dr. Dupre on December 15, 1951, about 7 o’clock p. m. He was complaining of a pain in the back and his statement to the doctor was that he was pushing a two-wheel hand truck loaded with a barrel of oil and attempting to shove it over an elevated sidewalk, the truck started to turn over, and, in attempting to right the truck, the patient suffered a pain in his back. He examined the plaintiff and provided him with a belt and gave him some sedatives to alleviate the' pain and told him to return again so he could determine whether or not the condition had improved. Plaintiff returned on December 18th, at which time the plaintiff told this doctor that he was worried as to whether he should continue with him or see the company doctor and that the plaintiff couldn’t make up his mind who he wanted to treat him. Dr. Dupre sent him to Dr. Reed Fontenot, the company physician. This physician further testified that he had been the plaintiff’s family physician for about twenty years, and he had never observed during any of that time any hypertension or high blood pressure that was disabling. His evidence further shows that plaintiff was hospitalized *395 on July 26, 1952, for a period of four days and he attended him for prostatitis and neuritis and that he discharged him on July 30, 1952. He further testified that the plaintiff could have a recurrence of a back strain or aggravate a previous disabling condition and that he talked to the plaintiff on numerous occasions in his office when he was examining or treating his children and that the plaintiff would continually tell him that he was not getting any better and that he was worried about his condition, but that he never examined plaintiff or treated him after he was discharged on July 30, 1952.
Dr. Reed Fontenot, the regular physician of the defendant, first saw the plaintiff on December 21, 1951, after he was referred to him by Dr. R. E. Dupre. Plaintiff reported to this physician that the accident happened to him on December 12, 1951, while pushing a wheelbarrow against a cement sidewalk, he twisted his back. Plaintiff stated to this physician that he thought it would get better, and that on December 15, 1951, he reported to Dr. R. E. Dupre. This physician administered diathermy and sedatives and saw the plaintiff again on December 28, 1951, when he was still complaining of pains in his lower back, and he subsequently saw him on January 9, 1952, determined that he was very much improved and discharged him. Plaintiff returned to this physician on March 7, 1952, complaining of the same pains and also on March 10, 1952, when he was given sedatives and diathermy. This physician did not see the plaintiff again until July 14, 1952, when he reported to his office complaining of low back pain and told this physician that he had just been released from the hospital, at that time, and he had been having prostate trouble. The physician’s diagnosis at that time was that the plaintiff had prostatitis, high blood pressure, hypertension and low back pain; he was asked what he attributed the low back pain to and at that time he stated that he was undecided but after clearing up the prostatitis and the continuation of the pain, he attributed the low back pain to the previous low back strain and, in addition, to the patient’s posture, knock knees and flat feet. At this time the plaintiff was given prostatis massages for his prostatitis. He was given diathermy and was fitted with a lumbosacral support'; he was given mild sedatives to help control his blood pressure at the same time and was instructed not to eat too much salt. The following July 28, 1952, plaintiff was regularly treated with diathermy from that date through July 31st; then on a recurrence of his prostatitis " which at that time had practically cleared up, but plaintiff suffered á recurrence on August 8th. Diagnosis at that' time revealed prostatitic secretion loaded with pus and plaintiff’s blood pressure had gone back to 180/16; on August 18th plaintiff returned to this physician again, and he found that plaintiff’s prostati-tis condition had improved very much, and he still was complaining of his back and he was then given diathermy and was instructed to return daily for diathermy. Diathermy treatments are given for the purpose of increasing the circulation of the muscles of the low back and is used in treating several conditions, including rheumatism, arthritis, back strains, etc. That these treatments were administered to the plaintiff for back strain along with salicylates, because some rheumatic condition plaintiff was probably suffering from. This physician referred the plaintiff to Dr. C. O. Frederick of Lake Charles, a genito-urinary specialist, for consultation on plaintiff’s prostatitis, and that this physician reported that this condition had cleared up and was not of a serious nature.
The plaintiff had been previously referred by the defendant to Dr. Simon, who, according to the report furnished this physician, was provided with a lum-bosacral belt to wear while he worked. This physician further testified that plaintiff was released from treatment for a short period of time and returned with the same complaints and that on November 17, 1952, he was discharged to return to work. He was asked whether or not he made any recommendation or had an understanding with the plaintiff as to whether or not he was supposed to return to heavy duties or light duties, to which he replied that there was no definite understanding *396 except that his understanding was that the plaintiff’s job was not of the hardest type of work being done for defendant and that he considered that he could do it. He thought that between June of 1952 and. November 17,, 1952, plaintiff’s condition had improved and that his blood pressure was down to 160 systolic over 100 diastolic and that his back was definitely improved to where he thought plaintiff could do all the work he had previously been doing and that the plaintiff wanted to return to work. ,In July, 1952, this physician found that plaintiff had some spasticity of the .lower lumbar muscles and that he complained of pain in raising the right leg and that he complained of tenderness over the lumbosacral joint. Following plaintiff’s return to work on November 20th, 1952, this physician did not see the plaintiff until on January 7, 1953, when plaintiff wanted this witness to talk to his do.ctor (Dr. Dupre) about putting plaintiff on a lighter job and this witness suggested that he return to work and try to. keep up with his present work. This witness stated that the plaintiff was complaining of his back when he worked hard and. that he wasn’t having one of his back spells. He next saw plaintiff on- January 22, 1953, at which time the plaintiff complained that he couldn’t do his work, that his back hurt too much when he worked hard and that he had pains in the lumbosacral joint in the- right leg, right -thigh and around the area of- the right knee. This physician examined the plaintiff at that time and the only thing he could find was the subjective complaint-of pain of pressure, over the lumbosacral joint; that the elevation of the right leg was practically normal, but the plaintiff did state that he experienced pain when he raised it; that after January 22, 1953, he cotrimenced giving the plaintiff electrical stimulations for the purpose of strengthening his back with the prime objective of relieving .his backache and that this phyr sician continued to administer these treatments up,until the time of the trial. Plaintiff then attempted to show by this witness that he could have suffered additional injuries to his back by continuing to do heavy lifting and hard work and that if the lumbosacral strain had not completely healed, any hard work or heavy lifting would aggravate the weak back condition. It was this physician’s opinion that if the plaintiff’s complaints were genuine, he would not be able to perform heavy labor continuously. He was asked if the plaintiff could do and perform heavy work regularly and it was his opinion that he doubted if the plaintiff would ever be able to perform heavy duties because he had developed hypertension, has a weak back and had suffered a lumbosacral strain, but a weak back which will possibly remain weak a great deal. It was further this physician’s opinion that if the plaintiff did not strain himself beyond his capacity, the work he was doing would strengthen the muscles of his back but if he went beyond the capacity of his muscles, he would have a recurrence of the strain and that - with the proper amount of rest the lumbosacral strain as far as this witness knew would eventually recover almost to normal to where a person could return to work. On cross-examination Dr. Fontenot testified that he found no objective symptoms of an injury to plaintiff’s lower back, from the time of his first examination on December 21, 1951, up until the time he saw him in July of 1952, except rigidity of the lower lumbar muscles on the right side and some diminution in right leg raising and pain in the right leg. This rigidity spoken of by the physician means muscle spasm and that it had disappeared by the middle of June when the patient was discharged and this physician filed his report to the company; that this physician had never sent a bill to the defendant company for treating the plaintiff for the services rendered by him between July, 1952, and June, 1953, but that, in his words, there was more or less an understanding that this treatment was authorized. He was then told by coimsel for defendant the usual duties performed by plaintiff and he made this statement:
“I think he could do it. I think he could have done it — something very light — work like that — working in the *397 yard — shovelling and ■ cleaning out ditches I would consider that as light work. It’s hard for me to judge just how hard some of these things are to do, because I have never done them myself, but I know that this is not like working in a.warehouse, from what I hear from the boys. I think he would do that type of work. There is one thing to be considered in that, is the heat. His blood pressure has varied some, but it is high at the present time. It has been high recently, one hundred eighty systolic. In the last week or so it has been that high. In such cases a person shouldn’t get overheated.”’
There is some testimony from this physician that the plaintiff’s being unable- to work could have had some bearing on his high blood pressure and that it would only be temporary, but it would not be disabling for ordinary work; that is when his blood-pressure was 160/100 and unless, the plaintiff showed signs of cardiac enlargement, shortness of breath or signs of kidney damage.
Frank Walker of the Safety Department of the defendant was familiar with the progress being made by the plaintiff under the treatment by Dr. Fontenot and knew that he was under Dr. Fontenot’s treatment after January, 1953, to the date of the trial, and that Mr. Walker never did tell him to discontinue treating the plaintiff and neither did he tell him that the company would be responsible for his services.
Dr. H. Theodore Simon, who testified by deposition, first examined the plaintiff on June 18, 1952, and examined him the second time on October 19, 1953. The first examination was conducted by this physician at the request of the defendant, and the second examination was requested by defendants’ attorneys, Dubuisson & Dub-uisson. Plaintiff gave the same story to this physician that he did to Drs. Fontenot and Dupre as to the occurrence of the accident and told him he had been receiving heat treatments and was wearing a back belt which was ordered by Dr. Fontenot. On this physician’s first examination on June 18, 1952, it was his opinion that the plaintiff. was suffering from a lumbosacral sprain, .and that some of the clinical findings were suggestive, of a light remaining discomfort, and he advised that the. small sacroiliac belt previously provided the plaintiff by Dr. Fontenot be changed to a lumbosacral' belt which would be about 14 or 15 inches in width at the back with an aluminum strip at the back. He suggested that the plaintiff co.uld continue work with this particular lumbosacral belt or corset, which it more or less resembled. The-only objective condition reflected in his first examination, according to this physician; was that the- lumbar. dordotic curve was flat. He was returned for examination to this physician - who saw him on October 19, 1953, or sixteen months after the first examination. He found again that there was no spasm of the muscular structure controlling plaintiff’s spine and that his lumbar lordotic curve was normal, and that the motions of his spine were'complete. X-ray radiograms were made on both the examinations and examined by this physician and his findings concurred with that of the radiologist. He could find no reason for plaintiff’s continuation of complaint of pain .and it was' his opinion that plaintiff had cleared of the lumbosacral sprain for which he had seen .him over a year prior, .and he felt-that the plaintiff was able to return to is usual occupation. This witness was cross-examined extensively by plaintiff’s counsel -and an attempt was made to show that, plaintiff could have suffered successive strains and that with his attempt to continue his work the slightest .strain would cause a disabling condition. That after the plaintiff had recovered from the lumbosacral strain unless there was something which created a permanent disability or dysfunction by the accident, that the strains following would not cause disability in the form of aggravation.
Dr. C. O. Frederick, a urologist of Lake Charles, examined the plaintiff on August 8, 1952, for his prostatitis and also- made a complete examination of the abdomen, genitilia and X-ray study of the kidney, urethra and bladder, and at the time of his *398 examination plaintiff was not disabled on account of he found no evidence of pros-tatitis. ' He did not make any examination of plaintiff’s back or spine and at the time of ■ his examination the plaintiff was able to do and perform his work insofar as his examination went.
Dr. James Gilly, a qualified orthopedic surgeon of Lafayette, Louisiana, examined the plaintiff on January 26, 1953, at the request of defendant." The plaintiff’s chief complaint at that time was pain in his low back. He told this physician that he had had recurrent episodes of low back pain following the’ injury which he received while performing lifting duties approximately two years before. He found the normal lumbar curve present; there was no limitation of forward flexion or right or left bending; there was tenderness over the spinal process of the tenth dorsal vertebra and of the fifth lumbar vertebra on deep pressure. The leg tests Used in diagnosing disorders of the low back produced no complaint of pain at that time. The leg tests were equal by actual' measurement. Neurological examination showed a- general diminution of perception to pin prick over the right buttock, the right groin and in the entire right lower extremity. There was no muscle atrophy by actual measurement and the deep tendon reflexes were present and equal. Radiograms were made by Drs. Miles and Ramagosa, radiologists of Lafayette; they were examined and showed no evidence of fracture, dislocation or arthritis. In the lateral view, there was no- evidence of the straightening of the normal lumbar curve which denoted an absence of muscle spasm. It was this expert’s opinion that at the time of his examination the plaintiff exhibited no disability. This expert was cross-examined as to the possibility of the plaintiff suffering from a slight protrusion or inter-vertebral disc, and he stated that without being reflected by physical findings the "plaintiff could have incurred a herniated disc; that that was a question for a neurosurgeon to determine.
Dr. Dean H. Echols, a neurosurgeon of New Orleans, examined the plaintiff on April 30, 1953, and he gave the following testimony as to the nature and extent of his examination, as follows:
“Examination discloséd a non-educated Frenchman, whose cranial nerves are normal. The grip in his right hand was ninety units as compared to mine of one hundred and twenty. The grip in the left hand was eighty units, as compared to mine of 115. He demonstrated that he can walk on his heels and tiptoes, but says that the left lower extremity seems stronger. There is a suggestion that the right Achilles reflex is slightly diminished. There was something vaguely peculiar about the appearance of his trunk in walking, but there was no limp. When undressed, the back appeared normal. He was able to bend forward until the finger tips were within seven inches of the floor. Back bending reproduced his low back pain.
“Palpation at the lumbo-sacral level of the spine suggested that there was absence of. the fifth lumbar spinous' process. The abdominal reflexes were absent. The straight leg raising test caused some discomfort on the right side at forty-five degrees. On the left, there was no complaint at sixty degrees.
“It was difficult to demonstrate any sensory loss with a pin. However, there were a few areas on the right leg, below the level of the knee, where the pin seemed to be less sharp. No sensory disturbance could be detected above the knee.”
This witness further testified that he particularly studied the plaintiff with the view of establishing the diagnosis of ruptured disc if he could:
“Probably at least ninety per cent of people who have sciatica are suffering from a ruptured intervertebral disc *399 which is pinching one of the components of the sciatic nerve. Since a neurosurgeon’s chief interest in the low back pain and sciatic pain syndromes is the establishment of the diagnosis of ruptured disc and the surgical treatment of ruptured disc, I naturally studied Mr. Joseph Johnson with a view to establishing the diagnosis of ruptured disc, if I could. The chief arguments against a ruptured disc in his case were the absence of sciatic pain and the presence of some pain in the kneecap, and the paucity of objective findings.”
He further stated that a patient with almost no objective findings is operated on because of the severity of pain.
This witness also testified that this patient probably reflected a possible congenital abnormality of the lower spine in that there was an absence of the fifth lumbar spinous process but the X-rays were negative which he examined for any such conclusions and if the X-rays had confirmed his opinion, he would have thought plaintiff’s complaints could possibly be attributed to this congenital anomaly. This neurosurgeon specifically stated that he was unable to make a diagnosis of ruptured disc. He stated that his recommendation as to surgical operation resulted from what he called a diagnosis of the patient’s credibility. This physician finally stated thát the injury suffered by the plaintiff in the accident of November or December, 1951, and believing the history of the plaintiff’s case as it was told to him concluded that the injury which plaintiff described aggravated a pre-exist-ing condition and brought it into a painful state.
Dr. T. E. Banks, an orthopedic specialist of Alexandria, examined the plaintiff on March 20, 1953, and he stated that the plaintiff gave him the following history and that his examination revealed the following:
“The patient complained of pain in the back, and he stated that he had had this pain intermittently since an injury which he dated 18 December 1951, which was approximately sixteen months prior to the time that I saw him. He stated that he had been back to work at one period for six or seven months and then he' stopped work for about five months and started back to work in November of 1952 but stopped in January of ’53 because of persistent back pain. He was questioned and stated that his only history of injury.was in December of ’51, and he had had continuous pain in the back and occasional pain in the right buttocks since "that time.
* * * * * *
“Physical examination was limited to what is usually considered ortho-paedic examination of the body with main emphasis being on the findings in the back and lower extremities. He had some healed scars on his abdomen and he stood with a slight list to the left. He had a good range .of motion in his back but complained of discomfort on marked forward bending and bending to the right. When placed on the table he also complained of pain on hyperextension of the lower lumbar spines. There was pain in the region of the lumbo sacral joint and a little to the right thereof on pressure and it was felt that the tenderness -Was fairly well localized and consistent on repeated examination. Examination of the legs revealed equal leg lengths and some difference in the circumferential measurement of the legs with the right thigh being a half inch smaller in circumference than the left and the right calf being a quarter inch smaller than the left. Deep tendon reflexes were equal in both lower extremities and 'normal in their response. On testing sensation with the use of a pin there was a suggestive area of decreased sensation along the outer or lateral aspect of the right foot but this was not too far from normal. On straight-leg raising there was pain on the right at about one *400 hundred and twenty degrees and it was possible to raise the left leg up to ninety degrees which is considered normal. Those were the main positive findings on examination.”
His conclusions based upon his clinical and X-ray findings were as follows:
“I felt that the man had a rather mild persistent disability in his low back and I commented in my notes at that time that it was my impression that he might have a small herniation- or protrusion of the intervertebral disc at the lumbo sacral area to give him enough disability to keep him from doing heavy work, but not enough disability to keep him from doing some type of light work.”
The plaintiff did not tell this examining physician that he had suffered any accident or injury other than the one contended in December, 1951. The X-ray radiograms which this physician had made showed no pathology and- this witness found no loss of perception to pin prick in the left leg at all. This physician, like Dr. Echols, could not make a definite diagnosis of herniation of intervertebral disc.
It is our view that the most damaging testimony of this witness was when he was asked:
“Q. After the length of time from the accident you wouldn’t have classified it as a lumbosacral strain? A. A lumbosacral strain would not give you the signs of sciatic nerve irritation however' mild they had. Lumbosacral strain gives you pain in the midline of the low back without radiation to either buttock or leg. - When you have radiation of pain and signs of nerve root irritation you have to consider it being more than a lumbosacral strain and very likely a small herniation of the disc in that area.”
This witness’ testimony is predicated on the fact that the' plaintiff suffers possibly from a partial protrusion of an interverte-bral disc and he states that the only way to determine whether or not to make a positive diagnosis is either by surgery or autopsy and that the plaintiff had not been subjected to either; that he would not make a recommendation of the plaintiff unless he returned to work and was found to be unable to hold up and continued to complain of pain.
It is appropriate here to mention the plaintiff’s physical condition prior to, and at the time of the accident and subsequently, and particularly with reference to the work he was performing and whether or not the injury .was apparent to him at the time it happened and its effect. The following are excerpts from his testimony contained in the record:
“Q. Now Buck, when you were working for Cabot Carbon Company for the last several years, did you have an accident while you were working for them? A. Yes.
“Q. Do you remember approximately when that accident happened? A. In 1951. December. Sometime in December.
“Q. Now, Buck, particularly before that accident, did you have any trouble doing that heavy duty before the accident? A. .Before the accident I work good. I have some trouble in my back. I have some trouble after I get hurt, maybe for five months. Now I told Mr. LaFleur, I say “You better tell Frank Walker to bring me to the doctor before I got to stop.,
“Q. Now Buck, you have been talking about after the accident. I mean before the accident on December 1951, in the last year or so, did you have any trouble doing your heavy labor? A. No.
“Q. Now Buck, before we go into your trouble after the accident, I would appreciate your telling how this accident happened. A. I was with Harrison LaFleur and we were hauling oil barrels. We went to Unit No. 5. We were catching a barrel with the little wagón. He was helping me, but then he left me to do something else. I hit *401 the right wheel on the sidewalk and it twisted my back. I turned the wagon loose and Harrison came and caught it.
“Q. What kind of a pain did you have, Buck, and where? A. Right there. (Witness indicates in the small of his back, right below the belt.)
“Q. Did you finish your day’s work ? A. I finished the day’s work, but he didn’t let me lift any more barrels.
“Q. ¡Now Buck, did you go to a doctor after that accident? A. Yes, I go soon after I got hurt. I go tell Olipsey. So I told Olipsey. He said ‘You are going to see the doctor?’ I said ‘Yes’. So I stayed maybe three days and it go ahead worse. So I go at Dr. Dupre.
“Q. What did Dr.' Dupre do for you? A. He gave me a back support and I believe a shot too.
“Q. Did you see Dr. Dupre again? A. Yes, two or three days after that.
“Q. And did you see any other doctor at that time? A. After that I went to Dr. Reed Fontenot.
“Q. Did you miss any work during this time? A. I believe after .the accident I stay on the job maybe four or five months, but it continued to hurt when I worked hard. The last job I done before I got to go home, I am working at a furnace. The last day I worked in there my back hurt me, but I finished the day. • I worked in the yard after that two days, but the last day I had to quit, because my back would hurt me.
“Q. Did you go see a doctor when you quit? A. Yes.
“Q. Which doctor? A. Dr. * * I go see Dr. Dupre.
“Q. And did you see any other doctor? A. Dr. Dupre and Fontenot treat me, and I go ahead take a treatment from Dr. Fontenot.
“Q. And what kind of treatment did you take from Dr.- Fontenot,- Buck? A. I can’t ñamé it good. But electric pad he had on me. I don’t know the technical name.
“Q. Before you stopped working, what was the kind of pain that you had in your back that made you stop working? A. Well it hurt me in my back.. Start right there, and all my hips and sometimes my knee is missing. My knee buckles when I walk a lot, and it hurts me in my leg and back. (Witness indicates from 'his right -front and back, and below his belt, and down his right leg). .- ;
“Q. Between the time you got hurt, Buck, and the time you stopped working, did your back hurt you? A. Yes, but when I didn’t work hard, it wasn’t as bad. The reason I stayed after the accident and worked was because I worked in the yard, and when my back hurt too much I could do easy work.
“Q. But if they wanted you to do heavy work, you had to do heavy work? A. Yes, except towards the last, I couldn’t do it.
“Q. Why did you keep working if it was hurting you so much? A. I have a large family. I like' my job, and I didn’t want to lose my job. I went as far as I could.
“Q. Now Buck, after you stopped working the first time after-the accident, about how often did you receive these electric pad treatments from Dr. Reed Fontenot? A. Every other day. I don’t remember exactly.
“Q. Did you wear a back support belt during the time that you worked for Cabot after the accident? -A. Yes.
“Q. Which belt was that, by the way ? A. A back support. ■
“Q. When you were being treated during the summer by Dr. Reed Fon-tenot, did you also wear a back support 1 belt'? A. Yes.”
*402 This evidence surely reflects that plaintiff knew he had hurt his -back and was provided with a belt support which he continued to wear following the accident and all during the time he was receiving the diathermy from the doctor. Can this court say that the injury 'had not developed at the time of the accident when by plaintiff’s own testimony he say's that his back hurt after the accident and continued to hurt him and that the only reason he continued to work while his back was hurting him was because he had a large family and liked his job and did not want to lose it? The point we are dealing with here is whether or not an injured employee working or trying to work under a disabling condition caused from an accident experienced during the course of his employment can toll a statute of peremption when he knows that any strenuous effort on his part causes him to suffer increased pain.
We believe, as the Trial Judge so stated in his opinion, that the plaintiff was illiterate and that he did his work as long as he could and was not a malingerer and is not crazy and wouldn’t discontinue his work and lose the wages he was earning, as well as the other benefits, unless he was totally disabled, but we are afraid that his desire to support his family and continue on his job serving his master has militated against his right to successfully prosecute a claim for compensation for disability occurring more than onfe year prior to the time he filed his suit, because we .are powerless to extend' the time of peremption when the disability is manifest at the time of the accident, or immediately following it and especially is this true when the injured employee continues to receive medical treatment as the plaintiff did in this case under the evidence we are bound to hold that the injury and disability was. continuous. It does not appear from the record or from plaintiff’s petition that any subsequent injury happened to ‘him other than the one experienced on December 12, 1951.
The Supreme. Court in the case of Mottet v. Libbey-Owens-Ford Glass Company, supra, stated that the amendment 'herein-above referred to precluded the application of the statute when an employee received an injury flowing from an accident that later develops into disability and that such an injury was excepted from the general rule and that his right of action was not perempted until one year after the injury had developed.
It held in that case that the injury under the evidence did not develop into total disability until the employee could no longer pursue his trade.
In that case the plaintiff was a glass cutter. On January 27, 1946, he experienced a very acute pain in his back after noon on that date. 'After he completed his day’s work, he consulted his physician who diagnosed his condition as neuritis. He continued his work until his regular vacation in September, 1946, at which time he visited Johns Hopkins Hospital in Baltimore, and was examined by an orthopedic physician. It was then discovered that he had partial thinning of the fifth lumbar in-tervertebral space. On his return to his employment, his employer was informed of the condition and plaintiff’s work was changed to that of lighter work and he continued to follow this light work until March 11, 1947, when, on account of the pain suffered, he had reached a state of total disability. We do not have that factual situation here on behalf of the plaintiff because the plaintiff in the case at bar was examined and treated for a lumbosacral sprain immediately or shortly after the happening of the accident and these treatments were continued up to and at least until March 10, 1952. They were resumed in July, 1952, and were being continued at the time this case was tried twelve months later. The lumbosacral belt with which the plaintiff was first provided was not of a proper size and different size was provided by the representative of defendant on instruction of Dr. Simon when plaintiff was examined by him on June 16, 1952. It is the jurisprudence of this state that when an employee suffers pain and discomfort on account of an accident suffered during the course of his employment in an attempt to perform his duties, he is totally disabled, and the plaintiff in this case repeatedly tes *403 tified that, he suffered excruciating pain from the time of the accident, and it is so alleged in his petition,
“It is now too well settled in our jurisprudence to even cite authorities that if a claimant can substantially do his duties only with pain and discomfort, he is entitled to compensation for his disability. In our case, the evidence preponderates to the effect that plaintiff, within the purview o'f the compensation statute, was disabled from performing his former duties up to the collapse of the vertebra on September 7, -1944.” Vautrot v. Maryland Casualty Co., La.App., 1947, 32 So.2d 500, 503.
See also Carlino v. U. S. Fidelity & Guaranty Company, 1941, 196 La. 400, 199 So. 228; Hingle v. Maryland Casualty Company, La.App., 1947, 30 So.2d 281; Taylor v. Marion T. Fannaly, Inc., La.App., 1948, 36 So.2d 912; Lee v. International Paper Company, La.App., 1944, 16 So.2d 679; Brown v. Furr, La.App., 1944, 19 So.2d 283; Rigsby v. John W. Clark Lumber Co., La.App., 1947, 28 So.2d 346; Godeaux v. Travelers Insurance Co., La.App., 1952, 58 So.2d 427; Anders v. Employers Liability Assurance Corp., La.App., 50 So.2d 87, and Stansbury v. National Auto & Casualty Insurance Company, La.App., 1951, 52 So.2d 300.
With reference to the plea of prescription in this case, there is no difference in the facts adduced in support thereof than was in the case of Chauvin v. St. Mary Iron Works, 55 So.2d 617, decided by this court in 1951. In that case, as in the case at bar, the plaintiff suffered a back sprain or strain and was examined by two physicians and told to do light work. Instead of apprising his employer of the advice of the attending physicians, he returned to his same job and continued to do his same work and continued to suffer the pain and discomfort though he wore the back brace or lumbosacral belt with which he had been provided. This court held that his suit was not timely and that he had not been lulled into a sense of false security to defeat his suit for compensation. The plea of per-emption in that case was sustained on the facts reflected by the record.
Under the quoted section of the statute the one year limitation runs from the date of the accident where the injury results at the time of the accident. Now, certainly, when plaintiff was examined and administered to by two doctors following the accident and by the company physician for a period of three months, it can hardly be said that it did not develop at the time it happened. The distinction in the application of the point in time when this prescription commences to run was pointed out by this court through the late Judge Dore in the case of Theriot v. Cities Service Refining Corporation, La.App., 63 So.2d 465, 467, where it was stated:
“It is our opinion, in view of the plaintiff’s total failure of proving any accident subsequent to that of August 26, 1948, that his rights to compensation stand or fall on the accident of August 26, 1948. Of course, if the injury sustained on August 26, 1948 was a continuous one, then it is clear that his rights to claim compensation therefor prescribed at the end of one year. See Hannafin v. Pelican Cracker Factory, Inc., La.App., 185 So. 479; Richard v. Blair, La.App., 20 So.2d 577; Stephenson v. McCook Bros. Funeral Home, Inc., La.App., 27 So.2d 644; Perkins v. American Employers Insurance Co., La.App., 53 So.2d 462; Chauvin v. St. Mary Iron Works, La.App., 55 So.2d 617.
“On the. other hand, if it can be concluded from the evidence that the true injury caused by the accident of August 26, 1948 did not manifest itself until February, 1950, the suit would then be controlled by the peremption of two years and the suit would therefore be timely filed. See Mottet v. Libbey-Owens-Ford Glass Co., 1952, 220 La. 653, 57 So.2d 218.”
This case was decided after the case of Mottet v. Libbey-Owens-Ford Glass Company, and this court had in mind the jurist- *404 prudence announced by the Supreme Court in that case. Certainly, under the facts contained in this record the injury was manifest to plaintiff when it happened or immediately thereafter when he submitted to examination and'treatment by the two Ville Platte physicians.
The right to recover for disability under the compensation statute of Louisiana is one thing, and the right to file a claim is another, This is apparent by those adjudications .where the injury happens at the time of the accident, and the employee receives compensation or medical treatment for his injury at that time or immediately thereafter; and the other type of case is when the injury does not develop at the time of the accident or immediately thereafter but later does develop and under this section of the statute the suit has to be filed within two years from the date of the accident, and an employee’s claim is not barred until one year after the injury develops.
Under the evidence contained in this record, it is our opinion that plaintiff’s injury happened on-December 12, 1951 and his disability occurred at that time. His right to compensation was perempted one year from that date unless the period of peremption' was , interrupted by the payment of the $48 per week paid to him on account of sick benefits by the Aetna Insurance Company under the group policy carried by defendant in that insurance company and payment of sick benefits by it for its employees.
The evidence on this point is that the plaintiff, in company with his foreman, Olipsey LaFléur, went to Mr. Gibson, District Superintendent, and Mr. Bowen, the plant superintendent of defendant, on June 5, 1952 for the purpose of obtaining permission to see a physician. The question of whether or not plaintiff had received an injury on the job was fully discussed between the'superintendents, the foreman and the plaintiff. The plaintiff at that time was suffering from a cold and told the superintendents and the 'foreman, according to their testimony, that he was wanting to lay off because he was' sick and that he had not experienced any accidental personal injury. On June 9, 1952 his personal physician, Dr. R. E. Dupre, filled out the medical blank or report making demand on the insurance company for sick benefits under this policy. Mr. Frank Walker, defendant’s supervisor of safety and insurance for the Safety and Insurance Department of defendant, carried the plaintiff to ■New Orleans for examination by Dr. Theodore Simon, an orthopedic specialist, on June 18, 1952. The evidence of Mr. Walker shows- that this examination was being made to determine whether or not the plaintiff had any injury to his back. At that time plaintiff was wearing a back belt provided by Dr. Fontenot. Dr. Simon found that it wasn’t the proper type or size and suggested that the plaintiff be provided with a Camp lumbosacral corset at least 14 or 15 inches in width, and defendant, on the recommendation of this physician,'supplied this belt. Dr. Simon at the time of that examination found that the “lumbar lordotic curve was flat, and it was his opinion that the patient was clearing from a lumbosacral sprain; some of the clinical findings were suggestive of a slight remaining discomfort and this physician advised that the small sacro-iliac belt be changed to a lumbosacral belt which would be about 14 or 15 inches in width at the back with an aluminum strip in the back”. This physician at that time suggested that the patient could continue working with this particular type of lumbosacral belt or cor-s.et. The plaintiff did not resume work at that time.
The report of Dr. Dupre was transmitted by. the defendant company to the Aetna on July 15th, 1952, and thereafter the plaintiff was paid thirteen weekly payments of $48 each under his claim for sick benefits under the insurance contract, and thereafter was paid sick benefits by defendant for a period of ten weeks and two days. The evidence further shows that at various times between the time this claim was filed until the last payment was made, the plaintiff knew that these payments were being made under the.insurance contract and sick *405 ness plan and not on any demand he had made for weekly compensation, because he asked the office manager of defendant if he should not receive compensation and was told that the payments were being made for sickness benefits and that he was not due any compensation. The District Judge did not pass on this ground in overruling the plea of peremption and for that reason we have considered it here because it is urged here by plaintiff’s counsel in brief and oral argument,
The law is that a payment of .this kind, unless it is made as a subterfuge to circumvent the law or with the knowledge of the employer and employee that it was being made as a compensation payment, would not interrupt the current of peremption. These payments under the disability benefits of this group insurance contract did not interrupt the current of peremption any more than the wages paid plaintiff subsequent to the accident and injury on December 12, 1951 and earned by him up until the time he discontinued his services with defendant -on June 5, 1952. The plaintiff had collected sick benefits under this policy before 'this accident, and every employee in defendant’s employ' was covered under the policy and it particularly covered disability benefits occurring from sickness or from accident not' having a causal connection with plaintiff’s employment.
Under this policy the insurance company paid thirteen weeks’ disability benefits and the defendant had paid ten weeks and two days, through November 18, 1952. Plaintiff resumed his work on November 19, 1952.
It is. true that the defendant .had knowledge that the plaintiff suffered a lumbo-sacral strain on December 12, 1951, because it issued authorizations for medical treatment, but it is also true that when the plaintiff discontinued his services for defendant on June 5, 1952, it was not on account of any accident or injury suffered by him while in its employ. The same argument urged by the plaintiff here was urged by the plaintiff in Goodwin v. Standard Oil Company of Louisiana, 5 La.App. 737, contending that the payments interrupted the peremption, but the court held that at the time the ■ payments were made they were not being made as compensation payments but as benefits under' a plan inaugurated by the company for the benefit of employees not injured in their employ. The Court said in the cited case:
“If defendant intended to make these payments to plaintiff as compensation under the Workmen’s' Compensation Act for disability caused by an injury which it knew plaintiff has suffered while in its employ and said payments had been so received by the plaintiff, the position taken by counsel is unquestionably ' well founded. But it is also true that payments not so intended by the employer and not so received by the employee do not have the effect of prolonging the period for bringing such actions under the statute. It provides that in cases of personal injury all elaims are barred unless within one year after the injury the parties shall have agreed upon the payments to be made under this act or unless within one year after the injury proceedings have beeh begun under sections 17 and 18 of the act. Then follows the sentence which provides that—
“ ‘Where, however, such payments Have been made’, that is, payments for personal injuries and payments ‘made under this act’, the limitation shall noti take effect, etc.
“The words ‘such payments’, used in the second sentence of the section, refer to payments made under this act as-set forth in the first sentence of the section.
“Payments of compensation made by an employer to an employee according to the schedule laid down in the act, with knowledge of the injury and resulting disability, are in the nature of admissions of liability under the act. But the payment of a sum of money by. the employer, to his , employee is not *406 necessarily a payment of compensation under the act.”
The evidence does not show that plaintiff was given any light work assignments between the date of the accident and the time the suit was filed.
For the reasons assigned, the judgment of the Trial Court is reversed and set aside and judgment is now rendered in favor of the defendant and against the plaintiff sustaining the plea of peremption of one year to his demand for compensation and dismissing his suit without the payment of costs.